## Borys *v.* Halko et ux., Appellants.

Argued October 14, `1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*C. Bentley Collins,* for appellants.

*Daniel Marcu,* with him *Josef Jaffe,* for appellee.

OPINION BY STADTFELD, J., December 21, 1936:

This is a proceeding in equity wherein complainant sought from the defendants, the reconveyance of certain real estate situate at No. 2044 Blavis Street, Philadelphia. The bill of complaint alleges and the answer thereto admits, that in December, 1934, plaintiff was the owner of premises 2044 Blavis Street, Philadelphia; that during said month, while defendants were residing there with plaintiff, plaintiff agreed to convey the property to defendants, and defendants in return agreed to maintain and board plaintiff for the remainder of his natural life in comfortable style. The bill also alleges that plaintiff, at various times, gave defendants amounts of money totaling over $600, together with certain life insurance policies on the life of plaintiff. The answer denied the receipt of more than $290, which was returned to plaintiff, but admits the possession of the policies referred to and avers that defendants paid the premiums thereon since their issuance. The bill further alleges that defendant harassed plaintiff for the purpose of driving him from the premises, and finally put him out by force on June 30, 1935, all of which is denied in the answer. The answer avers that plaintiff left the premises of his own accord on July 9, 1935.

The chancellor found that plaintiff and defendants moved into said premises in December, 1934; that at said time, plaintiff and defendants entered into an oral agreement wherein plaintiff agreed to convey said premises to defendants in fee and defendants agreed to maintain and board plaintiff in a comfortable style for the rest of his natural life; that in pursuance of said oral agreement, plaintiff by deed dated January 2, 1935, and duly recorded, granted and conveyed said premises

to Katherine Halko in fee without limitation or condition; and in pursuance of said oral agreement plaintiff resided with defendants at said premises until June, 1935; that in violation of the terms of said oral agreement, defendants neglected or refused to maintain and board plaintiff in the comfortable style required by the agreement, and ultimately in June, 1935, evicted plaintiff from the premises by force; that in some manner, defendant, Katherine Halko, obtained possession of three insurance policies on the life of plaintiff, to-wit: Policies Nos. 90847573, 107097148 and 119989783 of Metropolitan Life Insurance Company and paid premiums thereon amounting to $78.50. There is nothing in or on the policies to indicate that the said Katherine Halko has any interest in the policies whatever. The policies were produced at trial and returned to plaintiff.

The chancellor found as a conclusion of law that the deed conveying the premises at 2044 Blavis Street in fee without limitation or condition passed no estate to Katherine Halko until plaintiff had received from defendants, competent maintenance during his life in pursuance of the oral agreement between the parties, and upon the neglect or refusal of defendants to furnish such maintenance to plaintiff, said deed should be cancelled; that plaintiff is entitled to all right, title and possession in and to the policies of the Metropolitan Life Insurance Company. A decree was entered in favor of plaintiff in accordance with the findings and conclusions above set forth. From that decree, defendants appealed.

The sole question in this case is whether the evidence was sufficient to justify the findings of the Chancellor.

The conveyance of the real estate in question by plaintiff to Katherine Halko, of respondents, in consideration of respondents' maintaining and supporting plaintiff for the remainder of his life is admitted. Whether plaintiff was forcibly evicted by respondents or whether

he left voluntarily was a matter for the determination of the chancellor.

Complainant, who is 53 years old, testified that in June of 1935, he came to his home at 2044 Blavis Street and that respondents were living there with their children; that Katherine Halko in company with a man named Stoczko, beat him up; they told him to move away from the house; this happened four or five times; that he was thrown out of the house like an old dog; that they took the insurance policies from him.

Mrs. Mary Burke, a neighbor, testified that after the Halkos received all of Borys' money and property, they began to mistreat him and when Mrs. Halko was asked whether she was going to return the money to Borys, she answered: "She says, 'O, you think that I am crazy? I put up with enough with him. I throwed him out. I don't want him. I ain't going to give him nothing.' "

Andrew Swan, a colored man who lived directly opposite 2044 Blavis Street, testified that on several occasions in 1935, he saw the Halkos put out Mr. Borys and push him down the steps.

Mrs. Margaret O'Farrell who lived next door to No. 2044, testified as follows: "A. I used to see them pushing him out and saying if he didn't get out they would kill him. Q. What did they say? What were their words? A. That he should get the hell out of the house. He said, 'No, this is my house,' and Mr. Halko, said, 'No, this is my wife's house. You get the hell out, I kill you.' So one night they pushed him out in the street terrible. Q. Where were you at the time? A. I was downstairs in my kitchen, and then when they started too much fighting I went upstairs and took the screen out of the window and I watched them out the upstairs window. ...... He came back then after that and they would not let him in, she would not let him in. She had the door locked and he used to knock on the door and she would not let him in."

422

William Devlin, another neighbor, stated that he boarded with his sister, Margaret O'Farrell, for a year and a half, and testified as follows: "Q. Did you ever see him get the hell out? A. No, I never did, no sir. Oh, yes; there is one thing I forgot. I went up there once afterwards to see Mr. Borys. I went to see him and when I went to the door Mrs. Halko came to the door and she opened the door and asked me in and I went in and her and her husband were both in there. She said, 'I guess you came to see Mr. Borys.' I says, 'Yes, I came to see Mr. Borys,' and she said, 'He ain't here no more.' I said, 'Is that so?' She said, 'No, we threw him to hell out.' Q. Who said that? A. Mrs. Halko, both of them said it at one time, and I said, 'Where is he? She says, 'Indeed, I don't know where he is.' I think as near as I can tell you that was in July, somewheres in July or something like that."

John Jaczyszyn, a nephew of Borys, testified as follows: "A. On May 5th, 1935, when Borys came to his house, half-past nine o'clock in the evening—Q. Were you there? A. Yes, I was with him there and Mrs. Halko and Mr. Halko came from Mr. Korhan's house. They passed to his house, 2044. Borys went to go into the house. She locked the door, she would not let him inside, and Mr. Borys tried to push the door inside to open it. I stay on the sidewalk. Mrs. Halko opened the door, let him inside, and grabbed him right on the neck, gave him about three or four fists on his head. Then I left, I go home. Q. Did he stay there? A. I stay home about half an hour, then Borys came to my house and cried. Q. What was his condition when he came there? A. And he got his—By the court: Q. Answer the question. What was wrong with his appearance? Was there anything wrong with his face or body or head or clothes? A. He got four marks on his throat. By Mr. Marcu: Q. What kind of marks? A. Finger marks. The next day I took him to the doctor. Q. Did

you ever talk to the Halkos? A. I talked to Mr. Borys, not to the Halkos. I say, 'Where is all your money?' Q. Where is he living now? A. He is living 1833 Bruner."

Katherine Halko was the principal witness in her own behalf. The bill of complaint alleged that the respondents were wrongfully withholding certain insurance policies of the complainant. Respondents' answer denied the averment and alleged that she was the beneficiary under said policies, and that she had paid the premiums thereon since their issuance. At the hearing of the case, it appeared that Anna Borys, wife of the insured (since deceased) was designated beneficiary, subject to change under the terms of the policy. Notwithstanding this, she testified at the hearing: "A. He came to my place, he asked me for policies, and, you know, I says, 'Mr. Borys, don't you know you transferred the policy, make a will for me and you start to pay so much money and I will give you policy back, if you give my money back.'" She also testified that the conveyance was made to secure loans totaling $400. made by her to plaintiff, $200 in October, 1934 and the balance in March, 1935, after the conveyance. During this period it appears that defendants were on relief, receiving $3.00 a week and Mrs. Halko was earning $6.50 a week. The chancellor found that her testimony in regard to the various transactions between plaintiff and herself was not reliable.

John Halko of respondents, testified that he was not present at the time Mr. Borys made the proposition to transfer the property to Mrs. Halko. He denied that they treated him badly or that he, Borys, had any trouble with him; that on July 9, the witness and his wife were absent from the house and when they came home their daughter informed them that Mr. Borys had left, and that they never saw him at the home afterwards.

A number of neighbors were called on behalf of defendants and testified that so far as they observed, the defendants treated Borys well and they knew of no quarrels between them.

The chancellor saw fit to believe the complainant and his witnesses. A careful examination of the testimony convinces us that it sustains the findings.

As stated in *Silverstein v. Boyle,* 306 Pa. 544, 546, 160 A. 221, at pp. 545, 546: "No purpose would usefully be served by a review of the many facts necessary to be taken into account in determining the controversy, as to which the chancellor made sixty-seven separate findings. The case is peculiarly one in which the findings of the trial judge, supported as they are by competent evidence, should be controlling with us. Our examination of the record leads us to the conclusion that he rightly found the facts and we are in accord with any inferences which he may have drawn from them or from circumstances brought to his attention. A chancellor's findings of fact when supported by evidence or reasonable inferences therefrom, when approved by the court in banc, have the effect of a verdict of a jury: *Feuerstein v. New Century Realty Co.,* 304 Pa. 271; *Belmont Laboratories, Inc., v. Heist,* 300 Pa. 542."

In the case of *Steininger v. Spaid et al.,* 300 Pa. 428, 150 A. 620, plaintiff brought an action of ejectment against defendants to recover a property which he agreed to give them in return for defendants' kind care of Steininger and his wife during Steininger's life. The defendants mistreated the plaintiff and thereafter the action was brought. A jury decided the issue in favor of plaintiff and Mr. Justice WALLING says, at p. 433: "If, as the jury found upon sufficient evidence, by failing to treat kindly and care for the plaintiff and his wife the defendants breached the contract, they forfeited the right to occupy any portion of the premises.

See *Soper v. Guernsey*, 71 Pa. 219, 223; *Bear v. Whistler*, 7 Watts 144. Defendant's rights were equitable and they must first do equity by a full performance or readiness to perform on their part: *Dreisbach v. Serfass*, 126 Pa. 32, 41."

The court prefers to treat deeds having such a consideration in the nature of an executory contract. The burden is on the grantee to show full performance of his agreement to care for the grantor. See *Davis v. Martin*, 8 Pa. Superior Ct. 133.

Nor do we see any error in the portion of the decree awarding the insurance policies to the plaintiff. Katherine Halko was not named as beneficiary therein, nor had the same been assigned to her. She had no interest therein.

The assignments of error are overruled and the decree of the lower court is affirmed. Appellants to pay costs.