## Payne, Appellant, *v.* Winters.

Argued September 29, 1950. Before DREW, C. J., STERN, STEARNE, JONES, LADNER and CHIDSEY, JJ.

*George S. Goldstein,* with him *Lewis J. Nescott,* for appellant.

*Stanton C. Fogie,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, January 2, 1951:

Annie M. Payne, appellant, filed her bill in equity against her son by a former marriage and daughter-in-law, Edward and Agnes R. Winters, to compel a reconveyance of real estate which she had transferred to Mrs. Winters. The *gravamen* of the bill was failure of

consideration and breach of a contemporaneous oral agreement providing that appellees should maintain, support and provide a home for appellant for the balance of her life. The chancellor, after hearing, held that a breach of the agreement had not been shown and dismissed the bill. This appeal is from the order of the court *en banc* dismissing exceptions to the adjudication and entering judgment in favor of appellees.

Appellant contends that the findings of fact are contrary to the testimony given by Edward and Agnes Winters and, therefore, arbitrary and without support in the record. Findings of a chancellor affirmed by the court *en banc* will be disturbed on appeal only where not supported by the evidence or where arbitrarily or capriciously made. Conclusions of law deduced from findings of fact are always a subject of judicial review. Where the decision rests upon ultimate inferences and conclusions to be drawn, the appellate court is under a duty to make such determination: *Noonan Estate,* 361 Pa. 26, 30, 63 A. 2d 80.

Annie M. Payne, plaintiff appellant, on January 24, 1942 conveyed to Agnes R. Winters the real estate of which she was then seized and where she, Edward and Agnes Winters and her son John Payne had together resided since the purchase of the property by Mrs. Payne in 1933 with proceeds from policies of insurance upon the life of her second husband. The home was a five room house with three rooms on the first floor and two on the second. She lived with her son John on the second floor. The Winterses, appellees, occupied the first floor. Edward paid no rent during the entire period. Taxes became in default and repairs became necessary.

Edward and his wife orally agreed with appellant who was then 60 years of age that if the property were transferred to him he would pay all taxes, past and

future, and give her a home as long as she lived; that the property would not be sold until after her death; that she should live together with them in the house for the rest of her natural life, and that they would look after, take care of, support and give her a home in the property. This is the chancellor's 7th finding of fact. Title was taken in the name of Agnes R. Winters because of difficulties in which Edward was involved at the time.

Mrs. Payne, at the time of the conveyance, was still living with her son, John, and his wife in the two rooms on the second floor. John was furnishing the food and clothing for and maintaining his mother, and had done so since 1938. John and his wife moved from the premises in August, 1942, taking with them all of their furnishings except a studio couch and a rug. Edward purchased a bedroom suite, including twin beds, which were placed in the front bedroom of the second floor for the use of appellant and appellees' daughter, then age 13. Appellant, beginning in August, 1942, ate her meals with appellees' family, had use of the entire house and was maintained by them.

Mrs. Payne testified that thereafter the bedroom suite was taken from her room and moved downstairs, and another and much older bed secured for her. A living room suite was brought from the first floor and placed in her bedroom. No dresser was provided for her. However, several weeks later a neighbor, Mrs. Roy Snyder, gave her a dresser so that she would have a place in which to put her clothes and effects. She was no longer permitted to eat with them at the table; there were times when she could not find food and would go hungry. The mattress and spring given her were from one of the twin beds and placed upon the much larger bed. She was told that she was filthy and smelled bad, and that her use of Vicks salve and other ointments

resulted in disagreeable odors about the house. She was not permitted to associate with any friends of the Winterses. Her presence and any conversation with her were studiously avoided. When she entered a room, appellees would leave and the door would be closed. Her granddaughters treated her with contempt and no endeavor was made by either Edward or Agnes Winters to change that attitude.

Edward Winters, called as on cross-examination, admitted that he agreed to give his mother a home as long as she lived; that she ate her meals in the kitchen and not with the family in the dining room, stating that they would not permit her to eat with them because she was too dirty; that he told his mother that he wanted her to remain away from anyone downstairs and suggested that he supply a hotplate and stove for her in a room on the second floor so that she could do her own cooking. "I want to leave her have a room upstairs and let her stay by herself so that she don't bother my family, don't come down at the table picking her nose, or something like that. I would rather have her up, be by herself upstairs. She can come and go any time she wants then." He admitted that his wife was not happy with his mother; that his children were not happy; that he did not want her to eat at the same table; and that he wanted her to remain apart from the family.

Agnes R. Winters denied that she threatened to put her mother-in-law in the Woodville Sanatorium, but admitted that on one occasion she suggested to her maybe she ought to be in Woodville. She denied having ever prevented her from eating, but stated that because of unclean habits and the use of salve, she did tell Mrs. Payne on one occasion when she was in the kitchen: "I told you once before to stay out of the kitchen." She stated that her doctor told her that "Either you have

to get rid of her [Mrs. Payne] or she has to get rid of you." She stated further that there was not much love between her family and Mrs. Payne, and that everybody would be much happier if they were apart from each other.

Patricia Ebner, a cousin of appellant, testified that she had lived directly across the street from the Payne home for a number of years; that Mrs. Payne came to her house almost every day; that she was not dirty or filthy about her habits; that she ate with the Ebner family; that on one occasion Mrs. Payne did have head lice, but that she, Patricia Ebner, and her children also had them; that everybody in the neighborhood had them; that Mrs. Payne complained to her about not having sufficient food to eat; that she had been in Mrs. Payne's room and observed the uncleanliness; that bedclothes were not washed; that the room was not dusted; that the bed which Mrs. Payne used was not a good one; that there was no place in her room for clothing which was allowed to remain on the floor or draped over a chair; and, that Agnes Winters' attitude toward Mrs. Payne was that of a complete stranger.

John Payne, appellant's son, testified that Edward had spoken to him about putting his mother in Woodville; that he knew they did not adequately wash her clothes; that the bed she was required to use was a "miserable one"; that she was not permitted to associate with other members of the family or their friends; that she was not dirty or filthy in her habits; and that her nervous condition had been aggravated since these family difficulties began.

Elizabeth Evans, a sister of appellant, stated that she visited plaintiff often; that she had not been there within the nine months preceding the trial, but whenever she had gone there Mrs. Winters "knocked her to

me and talked about her"; that Mrs. Winters told her that appellant would have to be put out because she made her nervous and she could not stand her; that on many occasions appellant complained that she was hungry and did not get enough food; that Mrs. Payne was never dirty, nor did she have disgusting habits; that her health had been failing, and in April, 1947, she took her to a doctor in Pittsburgh who reported that she was suffering from malnutrition and nervous exhaustion; and, that the reason she did not go to the Winters' home during the last nine months preceding the trial was because Mrs. Winters had said she did not want her in the house again.

Nellie Marshall, who had known appellant for more than forty years, had occasion to see Mrs. Payne on the porch in the summer of 1947. She heard Edward and his wife talking inside the house and heard one of them make the statement: "She is going to get out or go to Woodville."

From 1942 to 1947, Edward had spent for repairs $585.40, and paid taxes which approximated $94.00 a year, or a total of $830.00 on account of taxes, current and arrearages. The assessed value of the house is $2500.00 and the approximate present value is $4000.00. He also paid on account of doctor and hospital bills the sum of $85.20.

The chancellor concluded that Mrs. Payne was not evicted from the premises; that appellees did not offer for sale or attempt to sell the property; that they did not start any proceedings to have her committed to an institution, nor did they threaten to do so; and, that they provided her with a home and food, washed and ironed her clothes, and supported and maintained her. The court held that appellees complied with the oral agreement made at the time of the conveyance of the property, and accordingly dismissed the bill.

The chancellor's 15th finding of fact provided: "The defendants [appellees] have provided Annie M. Payne with a home, food, washing and ironing her clothing, and support and maintenance of her." This finding is clearly one of law and fact. Upon this finding are based the conclusions of law. Unfortunately, neither the opinion of the chancellor nor of the court *en banc* contains any statement regarding the necessary criteria to determine what constitutes "providing a home". We can only infer from the respective opinions that supplying of food, clothing, shelter and a minimum of medical attention would be sufficient. The appeal is from the evident holding by the court that the parties intended to limit the meaning of the word "home" to a mere place of abode, or provision therefor in connection with the house and family in question however separate and apart from the domestic ties of a household. The conclusion is inescapable that what was found sufficient compliance with the agreement was wholly without regard to the conduct of Edward and his family and their demeanor toward Mrs. Payne. The record is completely devoid of any evidence of filial regard or kindness toward appellant or consideration for the feelings of one approaching old age and burdened with the unfortunate incidents of epilepsy. To the contrary, it is replete with testimony not only from the witnesses on behalf of appellant, but also from the lips of Edward and his wife, that they did not desire to associate with Mrs. Payne and sought and desired that she be kept practically in seclusion, at least so far as their contacts with her were concerned.

We cannot, in the circumstances, ascribe such meaning to the use of the words "providing a home". The parties to this action are not strangers. Their oral agreement and the transfer of the property are not to be construed with the same nicety applicable to a

contract between total strangers. Appellees' obligation to provide "a home" is not discharged by merely permitting appellant to reside in the house and supplying her with the bare necessities of life. The conduct of Edward, his wife and children as clearly shown by the record was calculated to effect a realization by her that she was unwanted and virtually ostracized. The admitted attitude of appellees toward appellant in no way reflected considerate treatment. Abuse and personal indignities inflicted by words as well as by acts are inconsistent with any real concept of a home.

The chancellor's statement in his discussion that "The chief difficulty is due to personal difficulties arising after the status of the parties were changed by reason of the son, John Payne, and his wife moving from the premises in August, 1942" does not lend support to his conclusion that there had been no breach of the agreement by appellees. When viewed in light of all of the testimony, this statement emphasizes the total inability of appellees to adjust themselves to events which were reasonably foreseeable at the time the agreement was made and the property deeded to Agnes Winters. When they made their bargain they undertook to endure the annoyances consequent upon the infirmities of old age.

The concept of the word "home" in the circumstances here presented includes more than providing a room within a house and maintenance and support. It imports more than lodging, food and raiment. It embraces a personal family relationship conducive to material and spiritual well being. Performance by appellees of the obligations which they undertook required, among other things, courteous and respectful treatment of Mrs. Payne and assurance to her of at least a modicum of security and comfort. See *Whorton v. Snell,* 226 Ala. 525, 147 So. 602; *Winch v. Bean,* 62 N.H. 427; *Tippin v. Ward,* 5 Or. 450; 101 A.L.R. 1487.

A deed of the character under consideration is deemed to be in the nature of an executory contract. The burden rests upon the grantee to show full performance of the agreement to care for, maintain and provide a home for the grantor: *Dreisbach v. Serfass,* 126 Pa. 32, 40, 17 A. 513; *Borys v. Halko,* 124 Pa. Superior Ct. 418, 425, 188 A. 539; see *Swartz v. Hafer,* 354 Pa. 320, 47 A. 2d 244. A grantee's rights are equitable and to retain those rights full performance of duties or readiness to perform must be shown.

Appellees have not sustained the burden of establishing performance of their agreement. The testimony of Edward and his wife, if accepted as verity, affirmatively establishes that they did not perform their obligations and that the executory contract should be rescinded. Appellant is entitled to have the property reconveyed to her. If it be suggested that appellees should receive reimbursement for moneys expended in the payment of taxes, repairs and medical expenses, the answer is that it is they who have failed to do that which was agreed and thus themselves created the position in which they now are placed. Further, their total expenditure of $1400.00 spread over a period of almost six years is more than offset by relief from the burden of paying rent or on account of the purchase price of a home.

The order of the court below dismissing the bill in equity is reversed and the record remanded for the entry of an appropriate order directing the reconveyance of the property to appellant. Costs to be paid by appellees.