Eways *v.* Reading Parking Authority, Appellant.

Argued March 16, 1956; reargued May 25, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Charles H. Weidner*, with him *George F. Baer Appel, William R. Lessig, Townsend, Elliott & Munson* and *Stevens & Lee*, for Reading Parking Authority, appellant.

*James F. Marx*, First Assistant City Solicitor, with him *Daniel H. Huyett, III*, City Solicitor, for City of Reading, appellant.

*V. M. Casey*, with him *Charles J. Margiotti, Emanuel Weiss* and *Margiotti & Casey*, for appellees.

OPINION BY MR. JUSTICE BELL, June 25, 1956:

The lower Court enjoined the Reading Parking Authority from eminent domain proceedings to acquire plaintiffs' properties. Plaintiffs' properties, as well as the properties of Whitner Company, were situate or contained within Site F.

Did the Court below err in finding the Authority, which was created to construct an off-street parking facilities project, guilty of a manifest abuse of discretion and illegality in selecting Site F for a public parking facility?

The Reading Parking Authority was incorporated pursuant to an ordinance of City Council on September 9, 1953, under the "Parking Authority Law" of June 5, 1947, P. L. 458, as amended, 53 PS §10279. Section 9, as amended, provides: "The Authority shall have the power to acquire by purchase or eminent domain proceedings either the fee or such rights, title, interest or easement in such lands, as the Authority may deem necessary for any of the purposes mentioned in this act."

Among the enumerated purposes of the Act were the establishment of a permanent coordinated system of parking facilities, acquiring, owning and leasing land and facilities to be devoted to the parking of vehicles of any kind, the parking facilities to be for the fulfillment of public needs in relation to parking; Section 5, Act of June 5, 1947, P.L. 458, as amended, 53 PS §10275, page 87.

The City of Reading was confronted by grave parking and traffic problems, and the Reading Parking Authority was created to eliminate these problems and to develop a comprehensive off-street public parking project or program. The Authority employed the engineering consultant firm of Ramp Buildings Corporation. The engineering firm made numerous and detailed traffic studies, and thereafter submitted a survey and report to the Authority in which it recommended that certain locations referred to as Sites A, B, C and D, be used for immediate development, and Sites E, F and G, for secondary development. The Authority decided that Site D was unacceptable and, with the approval of the en-

gineering firm—this was advisable but entirely unnecessary—the Authority, by appropriate Resolution dated October 27, 1954, added to its *primary or immediate* program Site F.* This was the action which the lower Court considered to be a manifest abuse of discretion and illegal.

On December 22, 1954, the Parking Authority adopted a Resolution authorizing the execution of a lease to the City of Reading and a bond issue to obtain cash to acquire necessary properties and erect planned facilities.

On December 29, 1954, the Authority entered into a lease with the City of Reading, dated as of December 1, 1954, leasing to the City for 30 years the parking lots in Sites A, B, C, E and F, at a yearly rental of $63,000, and pledged the lease under an indenture securing $990,000. worth of Parking Authority bonds, which were delivered and paid for on December 29, 1954. The proceeds of these bonds were (as above mentioned) to be used for acquiring the properties enumerated in said Sites and constructing the parking facilities thereon.

On January 6, 1955, the Parking Authority adopted a Resolution that negotiations be conducted for acquisition of the properties which were situate or contained in the primary or immediate program.

On April 22, 1955, condemnation Resolution No. 2 of the Reading Parking Authority was adopted, condemning Eways's properties which are situate in Site F. The Authority never adopted any Resolution specifically condemning the property of Mr. and Mrs. Katzmiller.

On May 10, 1955, the Authority entered into a written agreement with the Whitner Company to purchase its properties which also are situate in Site F at a cost

---

* It also added Site E and modified Sites A and F.

of $54,200., which was $9800. less than their appraised value and their actual worth.

On May 20, 1955, plaintiffs filed the present complaint in equity for an injunction to restrain the Authority from acquiring (by eminent domain proceedings) their properties.

The pertinent principles of law have been recently stated by Chief Justice STERN in *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 109 A. 2d 331 (pages 572, 573) : ". . . whatever may be said of the merits or demerits of the site selected by the Housing Authority, plaintiffs wholly misconceive the extent of the judicial power to review the exercise of the Authority's discretion confided to it by the Legislature of the Commonwealth. The selection of a site for a large housing project necessarily involves many considerations; it is largely a question of practical judgment, common sense and sound discretion. By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, *in the absence of bad faith, fraud, capricious action or abuse of power*; * they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of *whether there has been a manifest and flagrant abuse of discretion* or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient

---

* Italics throughout, ours.

ground for interference; judicial discretion may not be substituted for administrative discretion. Accordingly, all jurisdictions which have had occasion to consider the question agree that a court cannot substitute its own judgment for that of a Housing Authority as to the proper site for a housing project. . . ."

The lower Court gave several reasons for enjoining the Authority—first, the Authority abused its discretion when it eliminated Site D and selected Site F in its primary program. Site D was eliminated by the Authority because "It was not a particularly desirable lot because of its location, because of its dimensions, and third it was eliminated on the advice of counsel because within the confines of the lot there were certain areas that there was some question as to our ability to acquire promptly. They were the three main considerations." The reasons given by the Authority are plausible.

The lower Court also felt that since the present program of the Authority was intended to accommodate not more than 20% of the off-street short time parking demand, the Authority should wait three to five years before putting into effect its secondary program (which originally included Site F).

The Authority adopted Site F and included it in its *primary or immediate* program, giving as reasons therefor the following relevant facts and factors:

"A. We considered location, location being immediately adjacent to the very high area of parking demand. We considered as a result of that location the very high rate of turnover in the car space. We considered the possibility of widening Cherry Street which would be directly a contribution to traffic, a secondary and major contribution to the lot itself. We considered in addition to that the size of the lot, in that it lends itself directly well to future expansion and further de-

velopment. In addition, the lot is supposed to be surrounded by three streets, which also contributes to its desirability. In addition, the cost of the lot appeared to us to be very reasonable and fair. Q. There has been some talk about whether the front of the properties on the west side of Fifth Street should not remain. Was that considered by the Authority? A. It has always been the Authority's effort to consider lot modifications, however, the three basic considerations are location, size, and cost."

These facts and factors justify the Authority's decision and we cannot say that they abused the wide discretion vested in them.

It is important to remember that the power, discretion and authority to select sites and a program for parking facilities was vested specifically, by the Parking Authority Law and by our decisions, in the Parking Authority, not in the consulting engineers, whose recommendations were merely advisory, or even in the Courts. As Justice CHIDSEY said, speaking for the Court in *Nine-Ten Chestnut Corporation v. Philadelphia Parking Authority,* 373 Pa. 274, 95 A. 2d 553: "The Act gives the Authority wide discretion as to the location and construction of parking garages, . . . . 'The function of the Authority demands that it be given a wide range of discretion. In devising an over-all plan for off-street parking in Philadelphia one of its most important tasks will be to exercise judgment as to the degrees to which it must directly participate in the business. This judgment will to a large degree depend upon a forecast of future requirements and an estimate of the suitability of present and anticipated facilities to satisfy them. . . .' "

Chief Justice STERN said in the *Blumenschein* case: "That the court might have a different opinion or judgment in regard to the action of the agency is not a suffi-

cient ground for interference; judicial discretion may not be substituted for administrative discretion. Accordingly, all jurisdictions which have had occasion to consider the question agree that a court cannot substitute its own judgment for that of a Housing Authority as to the proper site for a housing project . . . ."

The lower Court enjoined the Authority for the additional reasons: (a) that it was convinced that at least one of the proposed parking facilities, preferably Site D, should have been located *north* of Penn Street; and (b) Site F was chosen instead of D because Whitner Company "offered" to sell to the Authority their properties in Site F for their assessed value which was $9,800. less than the appraised value; and (c) because James B. Mercer, a member of the Authority, was Secretary and a member of the Board of Directors of Whitner Company. With reference to the lower Court's first objection, President Judge MAYS gave plausible reasons why he believed a parking facility should have been selected north of Penn Street. However, where as here it is admitted that there was no fraud or bad faith, it is the Authority's judgment which, in the absence of a manifest abuse of discretion—and under our cases there was none—must prevail.

The lower Court held that the controlling reason for the inclusion of Site D came about solely because Whitner Company offered to make a deal with the Authority to sell the property at a sum about $9800. less than its actual worth.* This was at best for appellees a conclusion which we consider unjustified by the evidence; equally important, it would not have justified the conclusion reached by the lower Court. The differ-

---

* We need hardly add that a purchase by the Authority of real estate at less than its actual worth certainly does not show an abuse of discretion on the part of the Authority.

ence between a genuine finding of fact, and an inference or deduction or conclusion, and particularly the effect, of each, is apparently not clear to the Bar, so we shall repeat what this Court said in *Peters v. Machikas*, 378 Pa. 52, 56, 105 A. 2d 708:

"Findings of fact made by a Chancellor who saw and heard the witnesses, when confirmed by the Court en banc, will not be reversed on appeal if they are supported by adequate evidence: Pregrad v. Pregrad, 367 Pa. 177, 80 A. 2d 58; Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729. However, that well-settled principle is confined to findings which are true and genuine findings of fact. 'With respect to [a] inferences and deductions from facts and [b] conclusions of law, both the Court en banc and the appellate Courts have the power to draw their own inferences and make their own deductions and conclusions: Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729; Noonan Estate, 361 Pa. 26, 63 A. 2d 80; Payne v. Winters, 366 Pa. 299, 77 A. 2d 407; Smith v. Smith, 364 Pa. 1, 70 A. 2d 630.': Kalyvas v. Kalyvas, 371 Pa. 371, 375-376, 89 A. 2d 819."

We come then to what we regard as the most important reason for the lower Court's action, namely, that Mercer, who occupied a dual and conflicting position, voted as a member of the Authority in favor of the Resolution to incorporate Site F in the *primary* project of public parking facilities. The lower Court held that Mercer's vote made the acquisition of *all* the properties *in Site F*, i.e., Eways's properties, the Kitzmiller's property and the properties of Whitner Company, null and void. The lower Court did not discuss what, if any, effect its sweeping decision would have on the lease to the City of Reading, and the above mentioned bond issue. In any event, we cannot agree with the conclusion of the lower Court that the Resolution to incorporate Site F in the primary project was null and void.

Sub-paragraph (d) of Section 11 of the Parking Authority Law, supra, reads as follows: "(d) No member of the Authority or officer or employe thereof shall either directly or indirectly be a party to, or be in any manner interested *in, any contract or agreement* with the Authority for any matter, cause or thing whatsoever by reason whereof any liability or indebtedness shall in any way be created against such Authority. If any contract or agreement shall be made in violation of the provisions of this section the same shall be null and void and no action shall be maintained thereon against such Authority."

The decision of the Authority to acquire Site F—which included (as above noted) the properties of each of the plaintiffs, and of Whitner Company,—was made and evidenced by a Resolution of the Board of Directors of the Authority; and neither the Resolution, nor the eminent domain proceedings against Eways, or the contemplated eminent domain proceedings against the Katzmillers constituted a "contract or agreement with the Authority" within the meaning of §11 of the Parking Authority Act. The Resolution was not, under said Act, null and void; nor did Mercer's vote invalidate the Resolution, or the lease between the Authority and the City of Reading, or the aforesaid bond issue, nor was it sufficient to bar eminent domain proceedings against the present plaintiffs. However, we strongly condemn Mercer's action in participating in and voting on the Resolution of the Board of Directors of the Authority to include in its present primary program Site F, even though there was no allegation or averment or proof or finding of fraud or bad faith on the part of Mercer or of Whitner Company or of any member of the Authority.

We may aptly repeat what we said in *Genkinger v. New Castle,* 368 Pa. 547, 551-552, 84 A. 2d 303: "It is a

well and wisely established principle of public policy in Pennsylvania that a public official may not use his official power to further his own interests. This principle originated in the common law and has become embodied in the Constitution of Pennsylvania [Art. III, Section 13] and has been declared to be the policy of this state in many Acts of Assembly: Reckner v. German Township School District, 341 Pa. 375, 19 A. 2d 402; Com. v. Raudenbush, 249 Pa. 86, 94 A. 555; Com. ex rel. McCreary v. Major, 343 Pa. 355, 22 A. 2d 686; 62 C.J.S. §402, p. 761; 43 Am. Jur. §266, p. 81; The Third Class City Law of June 23, 1931, P. L. 932, Art. X, §1009, 53 P.S. 12198-1009. The reasons for this must be obvious—a man cannot serve two masters at the same time, and the public interest must not be jeopardized by the acts of a public official who has a direct pecuniary or personal or private interest which is or may be in conflict with the public interest."

In *Meixell v. Hellertown Borough Council,* 370 Pa. 420, the Court said: "Two of the 9 councilmen cast a questionable vote; each voted for himself for the office of Burgess. Each of these votes was undoubtedly illegal and void and therefore a nullity: Genkinger v. New Castle, 368 Pa. 547, 84 A. 2d 303; Reckner v. School District, 341 Pa. 375, 19 A. 2d 402; Com. v. Raudenbush, 249 Pa. 86, 94 A. 555; Com. ex rel. McCreary v. Major, 343 Pa. 355, 22 A. 2d 686. . . .

"In Reckner v. School District, 341 Pa. supra, this Court held that a Director of a Third Class School District may not legally vote in favor of a resolution of the Board increasing his own salary as secretary thereof, and if his vote is the deciding vote, the resolution fails. Speaking through Justice (now Chief Justice) DREW, we said: 'In Commonwealth v. Raudenbush, 249 Pa. 86, this Court held that a councilman could not legally cast the deciding vote in favor of accepting his

own resignation so that he might be employed by the city in a salaried position. It was there said: (pp. 88-89) "We are of opinion that Raudenbush could not vote for the acceptance of his own resignation which, therefore, never became effective. In 28 Cyc. 337, citing numerous authorities to sustain the text, it is said: 'There is a general rule of law that no member of a governing body shall vote on any question involving his . . . pecuniary interest, if that be immediate, particular, and distinct from the public interest.' . . . It is against public policy for a representative of a municipality to vote in its legislative body on any matter which affects him individually." ' "

However, it is equally true that where a Resolution or Ordinance is passed or adopted by a sufficient number of legal votes, it will not be invalidated by improper or illegal votes if the contract or subject matter in question was lawful and there is no fraud or statutory restriction. To hold otherwise would injure the public interest or stifle government. *Marshall v. Ellwood City Boro.*, 189 Pa. 348, 41 A. 994. Cf. also, *Meixell v. Hellertown Borough Council*, 370 Pa. 420, 88 A. 2d 594.

In the *Marshall* case, 189 Pa., supra, a contract with a water company, of which Roelofs was a stockholder, was passed by a vote of five councilmen, including Roelofs. The Council body consisted of six members, one of whom was absent. The agreement was sustained because it was approved and the ordinance passed by the qualified vote of a majority of the members legally competent to vote. The opinion pointed out that the contract inherently was a perfectly legitimate contract which the parties were at liberty to make and which was not prohibited statutorily or otherwise. The case is well summarized in the syllabus, which reads: "Although a stockholder and secretary of a water company who is also a member of a borough council is disquali-

fied from voting on an ordinance for the supply of the borough with water by the water company, yet the ordinance itself is not rendered invalid by such a vote if it appears that the contract is legitimate, and that a majority of the members of the council without counting such member voted in favor of the ordinance."

Under all the facts in this case, we are of the opinion that the evidence was insufficient to establish a manifest abuse of discretion or bad faith or fraud or illegal action by the Authority with respect to Site F; it follows that the decree must be reversed. However, we express no opinion as to the validity of the agreement made between Whitner Company and the Authority for the purchase of the Company's properties by the Authority at less than their appraised value.

Decree reversed; each party shall pay his, their or its respective costs.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

In *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 573, 109 A. 2d 331, Mr. Chief Justice STERN succinctly stated the presently pertinent rule to be that "courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power . . . ." The instant case presents several of the specified situations, any one of which was sufficient to give the court below jurisdiction of the instant subject-matter.

The record before us amply justifies the conclusion that the action of the defendant Reading Parking Authority in drastically shifting the priorly fixed location of a garage unit, particularly in view of the disqualifying motivation found by the court below, was so arbitrary as to amount to an act of bad faith on the part of

the members of the Authority Board, and the acquisition of the Whitner Company property, in which a participating Board member was pecuniarily interested, amounted to an abuse of power.

Nor was the resolution legally sustainable because a majority of the five members of the Authority Board, exclusive of the disqualified member, had voted for it. *Marshall v. Ellwood City Boro.*, 189 Pa. 348, 352-353, 41 A. 994, is plainly not in point. There, the sanction ran against the offending member of council who, as a stockholder and secretary of the Ellwood Water Company, had voted in council for the contract between the Borough and the Water Company. As Mr. Justice GREEN pointed out,—"The literal reading of the 66th section of the act in question [Criminal Code of March 31, 1860, P. L. 400] deals with the individual and prescribes the penal consequences of his dereliction in very plain and emphatic terms. But those consequences are personal to the offender and do not in terms extend to, or embrace, the legal effect of the municipal transactions in which he participated. Nothing upon that subject is contained in the act of 1860." On the contrary, here paragraph (d) of Section 11 of the Parking Authority Law of 1947 denounces as null and void *the action of the Authority* in respect of which a disqualified member participated.

Consequently, the Board's action looking to the acquisition of the private properties necessary for the erection of a garage unit at Site F constituted a flagrant abuse of discretion for which the injunction granted below was the appropriate corrective.

I would affirm the decree at the cost of the appellant Authority on the opinion for the learned court below.

Mr. Justice MUSMANNO joins in this dissenting opinion.