ALENA LANK, WILLIAM D. LANK, SARAH L. MARSH and
ANNE W. WESTPHAL, Plaintiffs Below,
Appellants,

*vs.*

EDMUND F. STEINER, ELSIE L. STEINER and the President, Directors
and Company of the FARMERS BANK OF THE STATE OF DELA-
WARE, a corporation of the State of Delaware, Administrator
*Cum Testamento Annexo* of the Estate of JOHN C. LANK, De-
ceased, Defendants Below,
Appellees.

WILLIAM D. LANK, Administrator of the Estate of ALENA LANK,
Deceased, Defendant Below,
Appellant,

*vs.*

EDMUND F. STEINER and ELSIE L. STEINER, his wife,
Plaintiffs Below,
Appellees.

*Supreme Court, On Appeal, October 24, 1966.*

*Petition for Reargument Denied, November 10, 1966.*

*Aubrey B. Lank* and *Victor F. Battaglia,* of Theisen & Lank, Wilmington, and *Houston Wilson,* Georgetown, for appellants.

*Jackson W. Raysor,* of Tunnell & Raysor, Georgetown, for appellees.

WOLCOTT, Chief Justice; HERRMANN, Justice, and QUILLEN, Judge, sitting.

WOLCOTT, Chief Justice (for the majority) : This is an appeal from a judgment entered in two cases consolidated for trial. The litigation arises out of a family disagreement among the children of John C. and Alena Lank, both of whom died prior to the institution of the actions. The basic issue is the validity of stock options obtained from the Lanks by Mrs. Steiner, a daughter of the Lanks, and her husband (hereafter "Steiners"). Contesting the validity of the options are Mrs. Steiner's brother and sisters (hereafter "Lank heirs") who appeal from the Chancellor's holding of validity.

The following facts were found by the Chancellor:

In 1954 Edmund Steiner, one of the Lanks' sons-in-law, at the request of George Westphal, another son-in-law, was on the lookout for a good business in the Milford area which could be acquired by Westphal upon his imminent retirement from the Army. Ultimately,

an oil distributing business was acquired and incorporated as H. R. Phillips Co. The cost of acquisition was $45,000 of which the Steiners supplied $15,000; Westphal supplied $15,000, and the Lanks supplied $15,000. Each family received 150 shares of Phillips stock but the Lanks' shares were divided into 100 shares for Lank and 50 shares for his wife.

Lank was secretary and treasurer of Phillips and all the members of the families at one time or another were either officers or directors. The active management of Phillips, however, was left with Steiner and Westphal, with Westphal as president. The management of Phillips was conducted informally and the business prospered.

In 1959, at the age of 81, Lank was hospitalized and ultimately lost the use of his right hand. Following his release from the hospital he lived for awhile with the Steiners, but ultimately returned to his home in Milton where he required extensive nursing care.

Some time in 1960 negotiations commenced with two individuals from New Jersey, Foley and Wright, for the sale of Phillips and a related corporation. In late 1960 a fairly firm offer of $300,000 was made and later reduced to $275,000, about $600 per share for the Phillips stock. No contract of sale was entered into, however, because of the demands of a minority stockholder of the related corporation.

Meanwhile, in early 1960, Steiner and Westphal began to have trouble. Lank knew of this. Both Steiner and Westphal appreciated the importance of the Lank shares from the point of view of corporate control and both wanted to buy the Lank shares. In March of 1961 Westphal tried to acquire the Lank stock by offering to trade to Lank some long-term securities owned by him for the Phillips stock. Lank resented this and thought Westphal was trying to take advantage of him. As a result, Lank told Steiner that he desired that Westphal never acquire any of his stock. He then offered to sell it to Steiner. Steiner replied that he could not make the purchase at that time but suggested that Lank give him an option to purchase.

Accordingly, two options, one for 100 shares and one for 50 shares, were executed in 1961 by Mr. and Mrs. Lank, giving the

Steiners the right to purchase for a period of ten years the Lank shares at book value, exclusive of good will, with the right to renew the options for an additional five years. While it is not clear who made the suggestion of an option price based on book value, it is clear that when Lank asked what the value of the stock was, Steiner replied that the book value was $270 per share, which was correct.

Following the deaths of the Lanks in 1963, the Steiners tried to exercise the options but were refused delivery of the stock. This litigation followed.

Two contentions are made by the Lank heirs—first, that the options violate a so-called bylaw of Phillips and are thus invalid, and, second, that the Steiners stood in a confidential and fiduciary relationship to the Lanks which they took advantage of unfairly to obtain the options.

The so-called bylaw is in fact a stockholders' resolution to the effect that "any stockholder wishing to dispose of his interest in the corporation *to other than existing stockholders* must first offer his stock, at book value to the remaining stockholders." [Emphasis supplied.]

The Lank heirs say the plain intent of the resolution was to preserve the pro rata stockholdings of the existing stockholders under all conditions. We think to the contrary, however, for the emphasized language clearly indicates that the restriction, whatever its legality, applied only to sales to other than existing stockholders. Since the Steiners were at the time existing stockholders, the restriction had no application to a sale to them.

In support of their second point, the Lank heirs cite *Strong v. Repide,* 213 *U.S.* 419, 29 *U.S.* 521, 53 *L.Ed.* 853, holding that under special circumstances a director of a corporation acts in a fiduciary capacity when dealing with a stockholder for the purchase of his stock. The special circumstance in the Repide case was that the director did not disclose his knowledge of a pending sale of the corporation and kept his identity as prospective purchaser a secret by dealing with the stockholder through a third party.

In *Kors v. Carey,* 39 *Del.Ch.* 47, 158 *A.2d* 136, a decision which we expressly approve, the Court of Chancery held that the

special circumstance rule applies only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them.

The Lank heirs argue that knowledge of the Wright and Foley offer of approximately $600 per share was a special circumstance which Steiner should have informed Lank of when he obtained options to purchase at the book value of $270 per share. The Chancellor found, however, that Lank knew of the $600 offer since he, along with all the stockholders, signed a resolution at a stockholders meeting of October 30, 1960, authorizing the sale of corporate assets for a minimum of $270,000, or $600 per share. This resolution was adopted after disclosure to the stockholders of the Wright and Foley negotiations. The Chancellor further found that there was no change in circumstances between October, 1960 and the option date in 1961 which would justify the conclusion that Lank was not aware of the difference between the book value and the $600 offer.

The Chancellor found further that Lank's willingness to sell to Steiner at book value was reasonable for the reasons that Steiner had orally agreed not to exercise the options until after Lank's death so that Lank would reap the benefit of any sale in his lifetime, and that he was content to let Steiner have the stock at book value after his death because of his desire that Westphal never get his stock.

Accordingly, the Chancellor concluded that Steiner had breached no duty to Lank as a corporate fiduciary.

The Lank heirs argue, however, that irrespective of their contention that Steiner had breached a fiduciary duty, both he and his wife occupied a position of trust and confidence toward the Lanks, and that they, the Steiners, took advantage of this to obtain the options. This being so, they say, a presumption against the validity of the options arises because the Steiners obtained possible benefits at the expense of the Lanks. In an appropriate case, of course, such a presumption undoubtedly exists. *Peyton v. William C. Peyton Corporation*, 23 *Del.Ch.* 321, 7 *A.2d* 737, 123 *A.L.R.* 1482; *Pomeroy, Equity Jurisprudence (5th Ed.)* § 956.

However, in order to raise such a presumption the existence of a fiduciary relationship or of trust and confidence between the

parties to the transaction must be established as a fact. The party seeking to raise the presumption of invalidity must establish as the fact that the alleged victim reposed trust and confidence in the victimizer and relied on his judgment and advice. *36A C.J.S. Fiduciary* p. 385.

The Chancellor found as the fact that there was no such reliance by Lank upon the Steiners. Although Lank depended upon Steiner for information concerning the Phillips Company, and although, by reason of Lank's physical weakness, the Steiners had ingratiated themselves to Lank by doing things for him, the Chancellor found that Lank was a very independent man until his death, particularly with respect to financial matters. He also found that the things or errands the Steiners did for Lank never involved any discretion or decision on their part. They were things which Lank only permitted them to do because at his age he was physically unable to do them.

The Chancellor found the facts to be that a favorable family relationship existed between the Steiners and the Lanks, and that the Lanks "played favorites" but that the Steiners did not mislead them or consciously exploit this relationship. Under the circumstances, therefore, the Chancellor held that the failure of the Lanks to obtain independent counsel did not call for the application of the presumption of invalidity.

This appeal presents to us no question of law for decision. Basically, the contention of the Lank heirs is that the Chancellor misfound the facts to their prejudice. They urge us to ignore his findings and to make our own in their favor.

■■ On appeal from Chancery this Court sits in review of both the facts and the law. Our function is to review the evidence to test the propriety of the findings below. If the doing of justice requires it, and if the findings below are clearly wrong, then it is our duty to make our own findings and to ignore those made below. However, when the findings below are supported by the record and are the product of an orderly deductive process, we will accept them. Judicial restraint leads us to exercise our power to make our own findings of fact sparingly and only to the extent indicated. *Re Delaware Racing Association, Del.,* 213 *A.2d* 203.

 We have examined the evidence and are of the opinion that it supports the findings of the Chancellor. Furthermore, since most of the evidence consists of oral testimony, the Chancellor who heard and saw the witnesses was in a much better position to judge the credibility of their testimony. Under the circumstances, therefore, we will not disturb his findings of fact which, if accepted, demonstrate the validity of the options.

The judgment below is affirmed.

HERRMANN, Justice (dissenting) : I would reverse on the grounds that the undisputed facts and testimony establish that a fiduciary relation existed between Edmund F. Steiner and Elsie L. Steiner, his wife, on the one hand, and the latter's father and mother, John C. and Alena Lank, on the other, regarding the affairs of H. R. Phillips, Inc.; that by reason of such relation there is a presumption of invalidity of the stock options here in controversy; and that the Steiners have failed to overcome that presumption.

The following facts were established by uncontroverted testimony and stand undisputed:

John C. Lank was over 83 years of age and Mrs. Lank was 82 years old when they signed and delivered the options to the Steiners in March 1961.

About two years earlier, in January 1959, Lank had been stricken with pneumonia and, after release from the hospital, the Lanks lived with the Steiners. Lank had a relapse and was returned to the hospital; thereafter, the Lanks again lived with the Steiners during the period of recuperation. Mrs. Steiner looked after her parents after they returned to their home. Later in 1959 and early in 1960, Lank began to lose the use of his right hand and arm as the result of a neuropathic condition. This led to another hospitalization for which Mrs. Steiner made all the arrangements. While in the hospital, Lank's hand began to atrophy; his mind began to "wander"; and he became very despondent. He escaped from the hospital and walked the streets of Wilmington in his nightgown. After leaving the hospital, Lank had nurses at home around-the-clock until the middle of March 1960; thereafter, a housekeeper took care of the Lanks. Dur-

ing this period, Mrs. Steiner visited her father "three to seven times" a week, arranged for doctors and nurses, prepared and signed his checks, and took care of major and minor problems of the Lank household. Mrs. Steiner was the child who did most to look after and care for the Lanks during this period. She was "emotionally involved" because of their situation. In 1961, Lank's eyesight began to fail and he had difficulty reading. Although handicapped by age and illness, Lank remained a person of independence. Mrs. Lank became a patient in a nursing home in the Fall of 1962 and died there in September 1963. Lank died in May 1963.

Steiner acted with his wife throughout in helping the Lanks and in making frequent visits to them. They visited the Lanks more than any of the other children. Steiner kept Lank informed as to the affairs of H. R. Phillips, Inc., and Lank relied upon Steiner regarding such matters. In this connection, Steiner testified:

"Q. Isn't it a fact, Mr. Steiner that he [Lank] relied upon you with regard to his business affairs in H. R. Phillips?
"A. Yes, I would say so."

And in response to a question as to the ways in which Lank would rely upon Steiner with regard to the business affairs of Phillips, Steiner testified:

"The only thing that I know is that he trusted me, and trusted my word. I never lied to him."

Again, in referring to Lank's reliance upon him regarding corporate matters at the time the options were executed, Steiner testified:

"* * * And your testimony is that prior to this time he had relied upon you with respect to the affairs of the Phillips Company?

"A. That's right.
"Q. And on this occasion he asked you what you thought the stock was worth?
"A. Yes.
"Q. At that particular moment you were occupying a pretty high degree of trust in this particular transaction, weren't you?
"A. That's right.

"Q. He was depending on you to tell the truth as to what it was worth?

"A. That's right."[1]

Lank had been a surveyor; Mrs. Lank had been a homemaker with no business experience or background; Steiner, age 57 at the time, held a degree of bachelor of science in electrical engineering and had years of experience as salesman, engineer, and business executive. It was Steiner who first interested Lank in Phillips and the dealership in gasoline and fuel oil. The stock certificates purchased by the Lanks in 1954 were held by the Steiners in their safe deposit box from the date of issuance. Steiner was an active officer in Phillips from 1954 on.

At some time prior to March 28, 1961, Steiner had the stock options prepared by an attorney of his own selection; and the papers were prepared without opportunity of consultation by the attorney with either Mr. or Mrs. Lank. The option contracts were signed in the Lank home by the Steiners and the Lanks on the same day the Steiners brought them, the only witness being the housekeeper; but the nature of the papers were not explained to the witness. The options ran in favor of Mr. and Mrs. Steiner, or the survivor of them. One option covered Mr. Lank's 100 shares of stock; the other covered Mrs. Lank's 50 shares. Neither Mr. nor Mrs. Lank had the benefit of independent advice regarding the options. Both died before this litigation was commenced. Lanks' other children were unaware of the existence of the options until January 1963; and the details were unknown to them until after the death of both parents.

From these undisputed facts, the most reasonable inference to be drawn, in my opinion, is that there was a relation of trust and confidence such as to enable the Steiners to exert influence over the Lanks. It follows as a matter of law, in my view, that a fiduciary relation existed such as gives rise to a presumption of the invalidity of the stock options. See 3 *Pomeroy's Equity Jurisprudence* (5th Ed.) pp. 788-792.

---

1. In this connection, the trial court found that "* * * over the years Lank looked to Steiner for information concerning the corporation * * *"; and "It is true that Lank relied upon Steiner for advice concerning the corporation's affairs." See 213 *A.2d* 848, 852.

The Chancery Court inferred that the Lanks did not depend upon the Steiners as to the stock options;[2] and it is concluded therefrom[3] that there was no fiduciary relation. The majority affirms on the ground that this Court will not reverse findings of fact of a trial court which are "supported by the record and are the product of an orderly deductive process." The majority also states that it is our duty to make our own findings if "the doing of justice requires it, and if the findings below are clearly wrong."

I am unable to agree with this statement of the scope of appellate review in this case. It fails to make the necessary distinctions between the review of findings of basic fact and the review of inferences.

Inferences drawn from undisputed facts and testimony by a trial court are not clothed with the comparative impregnability accorded to findings of basic fact based upon demeanor evidence. We stated in *Nardo v. Nardo, Del.,* 209 *A.2d* 905 (1965) :

> "A distinction is also made between a finding of fact and an inference drawn from the facts. In any case, where a finding is a deduction, a process of reasoning, or a logical inference, it is the duty of this court to review the inferences made below; and, if we think justice requires it, we will draw our own inferences and reach our own conclusions in connection therewith. *New York Trust Company v. Riley, supra.*"

2. It is assumed for present purposes that the trial court and the majority are correct in considering actual dependency or reliance to be an essential element of a fiduciary relation. This is questionable, however. *Pomeroy* quotes with approval that a fiduciary relation arises "* * * wherever there exists such a confidence * * * as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him * * *." 3 *Pomeroy's Equity Jurisprudence* (5th Ed.) p. 791. And in *Peyton v. William C. Peyton Corporation,* 23 *Del.Ch.* 321, 7 *A.2d* 737, 747 (1939), this Court stated: "Confidential and fiduciary relations have the same meaning in law; * * *." Query: Does not the fiduciary relation arise from the confidence and trust which put the Steiners in a position to exert influence over the Lanks, regardless of whether they were actually influenced? Does not an attorney stand in a fiduciary relation to his client even though the client does not act in reliance upon the attorney's advice?

3. For certain other undisputed facts emphasized by the trial court in this connection, see 213 *A.2d* 848, 852.

And in *Nelson v. Murray, Del.,* 211 *A.2d* 842, 844 (1965), a custody case, we restated this proposition. Although we there accepted the trial court's findings of fact, we declined to accept its deduction and ultimate finding as to custody.

The majority opinion cites *Application of Delaware Racing Association, Del.,* 213 *A.2d* 203 (1965). It was there stated that this Court has the duty to draw inferences and deductions "if the requirement of doing justice requires it and if the findings below are clearly wrong." It is to be noted that in *Delaware Racing Association,* as in the majority opinion here, a "clearly wrong" [4] element was added to the *Nardo* and *Nelson* statements that we have the duty to draw our own inferences "if we think justice requires it." I am unable to agree with this change.

This Court's responsibility in the appellate review of inferences drawn from uncontroverted facts and testimony is not limited to an ascertainment that the inferences of the trial court are rational; our duty in this connection is not discharged by a conclusion that the inferences of the trial court are not "clearly wrong." We have the obligation, in my opinion, to draw the most reasonable inference from undisputed facts and testimony, and to substitute our inference for that of the trial judge if we are satisfied that ours is more reasonable than his.

Judge Learned Hand addressed himself to this concept in *E. F. Drew & Co. v. Reinhard* (2 Cir., 1948) 170 *F.2d* 679, 684, a case involving the question of "intent":

> "* * * When an appellate court is faced with that question, it is in substantially as good a position to answer it as the trial judge, provided it accepts as true all the oral testimony as we do here, so far as it was relevant. We yield to findings of fact, so far as those parts of the evidence which cannot come before us may have controlled their decision; we must assume that these evanescent factors may have been persuasive, unless what does

---

4. This "clearly wrong" element is to be compared to the "clearly erroneous" element of *F.R.Civ.P.* 52: "* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *."

come before us rationally forbids the conclusions, no matter what the unknown factors were. After giving them every possible probative force they might have, our problem therefore becomes the same as that before the trial court. * * *."

The principle was stated as follows in *American Tobacco Co. v. The Katingo Hadjipatera* (2 Cir. 1952) 194 *F.2d* 449, 451:

"We accept, as we must, those of the trial judge's inferences of fact which he drew directly from his estimates of the credibility of witnesses whom he observed as they testified in his presence/— *i. e.,* his inferences (sometimes called 'testimonial inferences') that certain facts existed because he believed some witness or witnesses who testified before him that those facts did exist. We are not required, however, to accept a trial judge's findings, based not on facts to which a witness testified orally, but only on secondary or derivative inferences from the facts which the trial judge directly inferred from such testimony. We may disregard such a finding of facts thus derivatively inferred, if other rational derivative inferences are open. And we must disregard such a finding when the derivative inference either is not rational or has but a flimsy foundation in the testimony."

See also Appendix to *Wabash Corp. v. Ross Electric Corp.* (2 *Cir.,* 1951) 187 *F.2d* 577, 601; *Ruby v. American Airlines* (2 *Cir.,* 1964) 329 *F.2d* 11, 22.

The Third Circuit distinguishes between the review of inferences and the review of findings of basic facts. In *Sears, Roebuck & Co. v. Johnson,* (3 Cir., 1955) 219 *F.2d* 590, 591, the Court ruled that the "clearly erroneous" test of F.R.C.P. 52 does not apply to inferences, stating:

"* * * In disturbing a district court's findings of basic facts, this court is guided by the 'clearly erroneous' provision of Rule 52(*a*). But Rule 52(*a*) is not applicable where, as here, the dispute is not as to the basic facts, but as to what inferences ( *i. e.,* ultimate fact) should reasonably be derived from the basic facts. This court, by examining the basic facts found by the district court, can determine, as advantageously as the district court can, whether or not an inference * * * is warranted. * * *."

See also *Lehmann v. Acheson* (3 Cir., 1953) 206 *F.2d* 592, 594. Similarly, in *Bagley v. Page,* 57 *R.I.* 186, 189 *A.* 39, 41 (1937), the Supreme Court of Rhode Island referred to the persuasive force of the findings of the trial judge but stated that, as it has often held, "an appellate court is in as favorable a position as a trial court to draw inferences from undisputed facts and testimony." And in *Corkum v. Salvation Army of Mass., Inc.,* 340 *Mass.* 165, 162 *N.E.2d* 778 (1959), the Supreme Judicial Court of Massachusetts held that where the oral testimony, not being in dispute, presents no question of credibility, it is in "as good a position to decide the case as was the trial judge"; and in doing so "we may draw our own inferences of fact from the basic facts shown, without deference to any inferences which might have been drawn by the trial judge." See also *Eways v. Reading Parking Authority,* 385 *Pa.* 592, 124 *A.2d* 92, 96 (1956).

I adhere to the rule stated in *Nardo* and *Nelson* and supported by authorities such as the above: This Court should draw its own inferences from undisputed facts and testimony when we think justice requires it; and we should not hesitate to substitute our inference for that of the trial judge when we are satisfied that ours is more reasonable than his. This is nonetheless so even though it cannot be said that the trial court's inference is unreasonable. Our function in this regard is based upon the proposition that the collective judgment of a number of appellate judges may properly be substituted for the individual judgment of the trial judge as to inferences which depend upon general information and experience and logic, and are not based upon the demeanor or the credibility of the witness. This function is not fulfilled, in my opinion, by the majority's ascertainment in the instant case that the inference of the trial court was rational—"the product of an orderly deductive process"—or by the determination that the trial judge was not "clearly wrong."

The most reasonable inferences to be drawn from the undisputed facts and testimony are, in my judgment, that a relation of trust and confidence existed between the Steiners and the Lanks such as to enable the Steiners to exert influence over the Lanks; and that the Lanks relied upon the Steiners as to the stock options. It is my conclusion that a fiduciary relation resulted as a matter of law.[5]

---

5. See first footnote on page 271.

A presumption of invalidity arises from such fiduciary relationship. In *Peyton v. William C. Peyton Corporation, 23 Del.Ch.* 321, 7 *A.2d* 737, 747 (1939), this Court stated the rule as follows:

> "* * * Confidential and fiduciary relations have the same meaning in law; and as every fiduciary relation implies a condition of superiority of one of the parties over the other, equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites. So, the principle is well established that a person standing in a confidential relation towards another may not retain benefits conferred by his principal in a transaction as to which competent independent advice is considered necessary, except upon a satisfactory showing that the principal had such advice in conferring the benefits. * * *."

I would conclude that the Steiners failed to overcome the presumption of invalidity, and may not prevail, because, in the absence of independent advice, they were unable to sustain their burden of proving that "there was no abuse of confidence and that the transaction was fair and free from the undue influence inferred from the relationship." 3 *Pomeroy's Equity Jurisprudence* (*5th Ed.*) p. 798. The Chancery Court erred, in my opinion, in relieving the Steiners of that burden of proof and in imposing upon the other parties in these cases the burden of adducing evidence that the Lanks were "misled" or that a "conscious exploitation of this relationship was the basis for the granting of the options." See 213 *A.2d* 848, 852. The doctrine of the *Peyton* case does not arise from exploitation by concealment, misrepresentation or fraud; it arises from the "very conception and existence of a fiduciary relation." 3 *Pomeroy's Equity Jurisprudence* (*5th Ed.*) p. 790.

Accordingly, I would reverse.