**Warminster Township Appeal**

*Robert T. Burke*, for appellants.

*George M. Bush*, for appellees.

MONROE, J., July 26, 1971.—This is an appeal from the filing of the auditors' report for Warminster Township for the fiscal year 1969. Appellees are four of the five-man board of supervisors of the township who held office during that year. It is alleged that these four public officials are liable to a surcharge for certain illegal expenditures which were received by them. The other member of the board is not involved in this proceeding for the reasons appearing hereafter.

## FINDINGS OF FACT

1. Warminster Township is a township of the second class located in this county. It has a population of approximately 35,000 and is approximately 10 square miles in area.

2. The 1970 budget for the township was about $900,000.

3. During the year 1969, the board of supervisors of Warminster Township consisted of five members: Mr. Charles E. Cotlar, Mr. Ronald Wallace, Mr. Joseph Lingo, Mr. Charles M. Hoffman and Mr. Albert W. Beyer.

4. On January 27, 1958, the board of supervisors of the township enacted an ordinance creating the office of township manager, designating the township manager as "the chief administrative officer of the township in connection with the duties delegated to him by the board of supervisors" and defining his power and duties as follows:

"SECTION 7: The power and duties of the Township Manager shall include the following:

"(a) He shall attend all meetings of the Board of Supervisors and of its committees, with the right to take part in the discussion, and he shall receive notice of all special meetings of the Board of Supervisors and of its committees.

"(b) He shall assist in the preparation of the agenda for each meeting of the Board of Supervisors and supply facts pertinent thereto.

"(c) He shall keep the Board of Supervisors informed as to the conduct of Township affairs in connection with his duties as Township Manager and shall submit such other reports as the Board of Supervisors shall request. He shall make such recommendations to the Board of Supervisors as he deems necessary.

"(d) He shall submit to the Board of Supervisors, as soon as possible after the close of the fiscal year, a complete report for the preceding year on the administrative activities of the Township of Warminster which are within the duties of the Township Manager.

"(e) He shall attend to the letting of contracts in connection with the duties assigned to him, in due form of law, and he shall supervise the performance and faithful execution of the same except insofar as such duties are expressly imposed upon some other Township officer by statute or ordinance.

"(f) He shall cooperate with the Board of Supervisors at all times and in all matters that the best interest of the Township of Warminster and of the general public may be maintained.

"(g) All complaints regarding services or personnel of municipal departments under the jurisdiction of the Township Manager shall be referred to him. He shall investigate and make a report thereon to the Board of Supervisors."

5. On December 30, 1968, the board of supervisors

of the township, by ordinance, fixed the salary of the township manager at $6,700.

6. During the year 1969 and for some time prior thereto, the board of supervisors and the township employed a total of approximately 50 employes who worked on a fulltime basis. These included a zoning officer, a housing officer, a building inspector, and various clerical personnel. The municipality also maintained a police force of 32 men and a road crew of approximately 12 persons.

7. In 1969, the township also employed a township manager, a Mr. Decker, who was available on a part-time basis and who received a salary of $6,700 per year. The average wage of a full-time manager for a township of the size of Warminster for the year 1969 ranged from $10,000 to $17,000. The salary paid to Mr. Decker was based on his part-time availability, and resulted in the need for the exercise of considerable responsibility by the supervisors which might otherwise have been delegated to the township manager.

8. There were various boards and commissions over which the board of supervisors exercised authority or with which the supervisors had township business. These included a park and recreation board, a library board, a planning commission, a zoning hearing board, an industrial advisory board and a municipal authority.

9. The board of supervisors met each Monday night and more often during the year 1969 in public session from 8:30 p.m. until about 9:30 p.m. or 10 p.m., for which they specifically received the compensation authorized by the legislature[1] of $10 per meeting to a limit of 50 meetings.

---

[1] Section 512 and section 515 of the Second Class Township Code of May 1, 1933, P. L. 103, Art. V, 53 PS §§65512, 65515.

10. Some 10 to 12 special meetings of the supervisors were required each year in order to prepare the annual budget alone.

11. In the four or five-year period preceding 1969, the supervisors had found that in order to keep up with township business, it was necessary to meet before and after the regular public meetings, and on two or three other evenings per week and on weekends. They were confronted with the necessity of employing a full-time township manager or, for economy sake, continuing to handle themselves the ever increasing burden of administrative detail that could have been delegated to a manager.

12. At the time of the reorganization meeting on January 6, 1969, the chairman of the board of supervisors, Mr. Cotlar, made the following assignments of responsibility: Mr. Beyer, director of roads and highways; Mr. Hoffman, director of planning and zoning; Mr. Lingo, director of municipal affairs; Mr. Wallace, director of fiscal and administrative affairs; and Mr. Cotlar, director of public safety. Thereafter, "Mr. Wallace moved that the board confirm these assignments and employ each of the assigned individuals at $100 monthly. This motion was seconded by Mr. Lingo. On the motion Messrs. Wallace, Lingo, Hoffman and Cotlar voted in favor with Mr. Beyer opposed." It is the payment of this $100 per month for 11 months to the several individuals other than Mr. Beyer which is the subject involved in this action. The assignments of responsibility in question were made in order to avoid duplication of effort, effect increase of efficiency and provide better administrative guidance at the lowest possible cost to the taxpayers. The $100 payment per month was arrived at by those voting in favor of the motion on the basis of $3 per hour charge authorized to be received by the supervisors for road inspection

and work by the Warminster Township Board of Auditors. It was felt by the supervisors that 33 hours per month was a conservative estimate of the time to be spent on township business beyond that spent in public meetings and the compensation was to be for the work performed in the respective assignments and for attending special meetings and executive sessions of the board of supervisors.

13. This action of the board of supervisors on January 6, 1969, the hiring of each of the appellees at the rate of pay of $100 per month, was taken only after consultation with the township solicitor and the receipt of his written opinion that such course of action would be legal and proper. There is no allegation or suggestion of fraud or collusion on the part of the supervisors in this case.

14. The payment of $100 per month to each appellee herein was not submitted to the township board of auditors for its approval or disapproval. This was withheld from the auditors upon the advice of the township solicitor.

15. In compliance with the resolution of the majority of the board of supervisors of Warminster Township adopted at the organization meeting of said board on January 6, 1969, hereinabove recited, each of the appellees was paid from the township funds the sum of $100 a month for 11 months during the year 1969, for a total of $1,100, for services rendered as directors in the areas of responsibility assigned to each of the appellees at said meeting, which said payments were in addition to the compensation payable to township supervisors by virtue of sections 512, 515, 531, 540 of the Second Class Township Code.

16. From the payments made by the township to appellees recited in the foregoing finding of fact, the

township deducted and withheld Federal income and Social Security taxes.

17. The township manager was not always available to answer questions, make decisions or become involved in the operation of the various departments of the township structure. When problems arose within the departments the township personnel would generally be expected to contact the supervisor in charge rather than the township manager and the supervisors were called upon more and more to make decisions on a daily basis.

18. The supervisor in charge of public safety for the year 1969, Mr. Cotlar, acted as liaison between the board and the police department and the volunteer fire department. In this regard, he made administrative decisions concerning the functioning of the police department such as type of speed checks to be run in the township, the posting of speed limit signs on the streets, the placement of traffic signals, the hiring of new police officers and the testing of existing officers for promotion, reporting and recommending to the board of supervisors on such matters as required board action.

19. The supervisor who was appointed head of fiscal and administrative affairs of the township in 1969 was Mr. Wallace, whose regular employment well qualified him for such an appointment. His responsibility under his assignment for the township included budget preparation and control, borrowings, investment of township funds, compliance with the various laws and regulations regarding financial matters and the gathering of financial information and giving of the same, as well as administrative decisions to the various department heads on a regular basis. In particular, he was in charge of a $300,000 bond issue and

a complete reworking of the township police pension plan, both of which required considerable time at meetings in the Philadelphia area.

20. Mr. Lingo was director of municipal affairs in 1969. In this capacity he attended approximately 125 meetings of the park and recreation board, the library board and the industrial development board. These were meetings which were held in the evenings or on Saturdays and did not take into account the time spent on the job such as daytime telephone conversations during which he would communicate administrative decisions to the appropriate boards and commissions and make trips to the township building on business. He spent 15 to 20 hours per week in his discharge of duties to this assignment.

21. Mr. Hoffman was the board member in control of zoning and planning in 1969. The township functions under his supervision were the planning commission, the zoning hearing board, the zoning office, the builders' inspectors office. He attended some 54 meetings of the zoning hearing board as well as at least 24 meetings of the planning commission and spent an average of from 15 to 20 hours per week in this particular area of responsibility. In this regard he traveled to the township building each day upon leaving his place of regular employment, remained there for approximately one to two hours, and answered questions and made decisions on a daily basis for the persons under his charge both at the township building and by telephone at his home or at his place of regular employment.

22. The actual expenditure of township funds during 1969 for the administrative functioning of the political subdivision was $11,100 which included the wages of the township manager and of the supervisors paid to them by virtue of the resolution of the board of

January 6, 1969, whereas the salary of a fulltime manager in a comparable township was approximately $17,000.

## DISCUSSION

Warminster Township has been a fast developing township in the last decade, increasing in population from approximately 16,000 in 1960 to approximately 35,000 in 1969. That increase in population has necessarily brought with it tremendous residential real estate development, and has been accompanied by substantial commercial and industrial development. This, in turn, has demanded that the municipal government expand its functions and activities in proportion to the increase in population and the residential, commercial and industrial development of the township. Zoning and building codes have been adopted and put in operation; a municipal planning commission has been created and is functioning; a municipal authority has been created for the furnishing of water and sewerage facilities to the public; the police force has been greatly expanded, and other advisory boards and activities have been undertaken. The board of supervisors has been increased in number from three to five.

The township has had a manager, but only on a part-time basis, and prior to 1969 it was the experience of the supervisors of the township that, by reason of the call of his personal business activities and the limited time available for township duties, he was unable to fully discharge the burdens normally falling upon a township manager. The supervisors found that persons or activities having business with the township or with whom the township did business were, with great frequency, calling upon the individual supervisors for advice and assistance and in many

instances there was a duplication of activities by the township manager and the various supervisors in attempting to thus serve the township's business. Apparently, no one supervisor was clothed with administrative authority to make decisions in any one field of governmental activity not requiring the action of the supervisors as a board, with the result that action was frequently delayed and the board was being burdened by being called upon to make administrative decisions not required by law to be made by it as a board.

Recognizing the need for a more efficient and expeditious administration of the government of the township and the governmental activities therein, the members of the board of supervisors devised a plan for assigning to each of the supervisors certain areas of responsibility, viz., highways, planning and zoning, municipal affairs, fiscal and administrative affairs, public safety and denominating the supervisors so assigned as the "director" of each such area of responsibility. Under this plan, each director was vested with authority to make administrative decisions not demanding the action of the full board and each director was required to report to the board decisions so made. Each such director would obtain all information and data required by the board for any necessary board action in the assigned area and report the same to the board. Each director was to be a liaison between the board of supervisors and the personnel of the particular activity to which the director had been assigned as well as with the members of the public doing business with the personnel of that activity. The plan also envisioned the retention of the township manager on a limited basis with compensation at $6,700 per year, the saving to the township of the cost of a full-time manager, the cost of which was running as high as $17,000 per year in the general area of the township

for townships of like size, but contemplated compensation to the supervisors for the work which they would be put to in discharging the demands of their directorships. The township auditors had authorized the supervisors to receive $3 per hour compensation for each hour spent in road inspections. Past experience had satisfied the supervisors that they would spend in excess of 33 hours each month in discharge of their directorship duties but they felt that it would be equitable for them to fix their compensation as directors at the rate of $100 a month each, i.e., 33 hours per month times $3.

The board of supervisors presented their plan to the township solicitor for his consideration and advice. In due course, each of the supervisors was informed in writing by the solicitor that in his opinion it would be legal for the various assignments to be made and for each of the supervisors to be compensated at the rate of $100 per month in addition to the compensation which they were entitled to receive for attending board meetings and for inspection of the roads of the township. The proposed payments of $100 per month were not submitted to the township auditors for their approval, as the solicitor had advised that it was not within their jurisdiction. The supervisors, who are the subject of this surcharge proceeding, were all of the opinion that the plan was legal in all respects. Accordingly, at the organization meeting of the board of supervisors on January 6, 1969, Mr. Cotlar made the following assignments: Mr. Beyer, director of highways; Mr. Hoffman, director of planning and zoning; Mr. Lingo, director of municipal affairs; Mr. Wallace, director of fiscal and administrative affairs; and Mr. Cotlar, director of public safety. Mr. Wallace then moved that the board of supervisors confirm the assignments and employ each of the assigned indi-

viduals at $100 per month. Messrs. Wallace, Lingo, Hoffman and Cotlar voted in favor of the motion, Mr. Beyer voted in opposition thereto.

Throughout the year of 1969, each of the supervisors carried out the duties of their respective assignments, which made deep inroads upon their private time requiring their devotion thereto in the afternoons and evenings after their day's work and their individual livelihood employment had been completed, and on the weekends and holidays. None of the supervisors submitted to the board individual records of their work or time spent in discharging the duties of their various assignments. We are satisfied, however, that more than 33 hours each month was spent by each of them in such work.

Each member of the board of supervisors was, during the year 1969, paid $10 for each public meeting of the board of supervisors attended by him to the legal limit of 50 meetings, as allowed by sections 512 and 515 of the Second Class Township Code (53 PS §§65512, 65515). Therefore, each supervisor received $500 in total for attending meetings of the board of supervisors for the year 1969. There were many additional meetings of the board of supervisors over and above the number of 50 each year, some public and some executive sessions of the board. Each of the supervisors was paid from the township funds the sum of $100 each month in addition to the compensation paid to him by virtue of sections 512 and 515 of the code for attending public meetings of the board of supervisors, with the exception of Mr. Beyer who refused the said $100 compensation each month. The testimony before us discloses that those supervisors who received the $100 per month accepted the payment as covering not only activities in their particular

assignments as directors but also for other activities as supervisors and for attending meetings of the board of supervisors which were not public meetings.

We are satisfied that each of the supervisors who is the subject of this surcharge proceeding performed his duties and accepted the monthly compensation mentioned in the firm belief that he was legally entitled thereto. We are satisfied also that their activities as directors removed the need of a full-time manager for the township during the year 1969 and that had a full-time manager been engaged for that year the expense of his salary to the township would have exceeded the amount of money which the township paid to its part-time manager plus the sums paid to the supervisors acting as directors for the year 1969. We are satisfied that the township benefited in discharge of the township business by the plan as adopted by the majority of the board of supervisors and its operation by the individual members of the board. But this determination cannot be the final solution on the issues before us.

Appellees rely upon section 516(e) and section 702, cl. LXII, of the Second Class Township Code, as grants of authority to the board of supervisors to appoint its individual members to the position of directors of the particular township activities to which they were assigned at the organization meeting of January 1969 and for the expenditure of township funds to compensate the appointees for their services in such offices or positions. They appear to acknowledge that prior to 1961, by reason of the provisions of sections 410, 514 and 511 of the Second Class Township Code, 53 PS §65410, 65415, 65511, supervisors could not at the same time hold any township office or position other than as a road superintendent, roadmaster or laborer

on the roads, or secretary-treasurer of the township.[2] But, they argue that the amendment of section 516(e) of the code by the Act of April 28, 1961, P. L. 153, 53 PS §65516, and the addition of cl. XLII, to section 702 of the code by the Act of August 27, 1963, P. L. 1280, sec. 1, 53 PS §65762, granted them, sitting as a board, authority to do what they did.

Prior to the amendment of April 28, 1961, sec. 516-(e), of the Second Class Township Code, provided as follows:

"Section 516. Duties of supervisors, township superintendents and roadmasters. — The township supervisors, or the supervisors acting as superintendents or roadmasters, shall—

. . .

"(e) Employ or hire such persons as may be necessary for the maintenance and repair of roads and bridges, and snow removal, and provide for the organization and supervision of the persons so employed, and work on the roads themselves when directed to do so by the board of supervisors. Records shall be kept, and reports made and filed, giving the names of all persons employed, including supervisors, superintendents or roadmasters, dates on which work was done and the number of hours worked with compensation paid to each person and the capacity in which he is employed."

By the amendment of April 28, 1961, the words in paragraph (e), "maintenance and repair of roads and bridges, and snow removal," were stricken and eliminated and substituted in the place thereof were the words "general conduct of the business of the township." This amendment was in effect in 1969 and with

---

[2] Section 511 directed the board of supervisors at its yearly organization meeting to appoint a treasurer-secretary of the township and authorized the board to appoint one of its members to that combined office.

respect thereto appellees argue, and we quote from their brief:

"It is obvious that in 1961 the legislature finally realized that many townships of the second class had a need for general powers far beyond the grant of authority to hire persons to work on the roads. The amendment which empowered supervisors to employ or hire such persons as may be necessary for the general conduct of the business of the township is broad and all inclusive. Nowhere within the amendment may one find an exclusion or limitation. If the legislature meant to exclude supervisors from the group who could be hired to conduct township business, it would have said so. It is not for a court to write such an exclusion or limitation into the law."

Cl. LXII of section 702, as added to the Second Class Township Code by the Act of August 27, 1963, P. L. 1280, 53 PS §65762, granted to the supervisors the power "To make and adopt all such ordinances, by-laws, rules and regulations not inconsistent with or restrained by the Constitution and laws of this Commonwealth as may be deemed expedient or necessary for the proper management, care and control of the township and its finances and the maintenance of peace, good government and welfare of the township and its trade, commerce and manufactures. No ordinance, by-law, rule or regulation shall be adopted which in any manner restricts, interferes with, hinders or affects the operation of any other political subdivision or instrumentality of the Commonwealth of Pennsylvania."

Appellees argue that the foregoing addition to the township code grants to the board of supervisors general authority to take any action which it deems expedient or necessary for the proper management, care and control of the township, unless such action adversely affects any other political subdivision or instru-

mentality of the Commonwealth, including employment of the members of the board for the purposes for which they were respectively engaged in the assignments made at the organization meeting of January 1969. We again quote from appellee's brief:

"We believe that this general grant of power, particularly when considered in connection with the 1961 amendment to Section 516, shows a clear-cut legislative intent to give supervisors the right to hire any person necessary to conduct the affairs of the township."

We do not accept the interpretation which appellees have placed upon the code amendments of 1961 and 1963. "Nothing is better settled than that a municipal corporation does not possess and cannot exercise any other than the following powers: (1) those granted in express words; (2) those necessarily or fairly implied in or incident to the power expressly granted; (3) those essential to the declared objects and the purposes of the corporation not simply convenient but indispensable": Lesley v. Kite, 192 Pa. 268, 274 (1899); St. Joseph Lead Co. et al. v. Potter Township, 398 Pa. 361, 364 (1959); Commonwealth v. Hanzlik, 400 Pa. 134, 136 (1960); Chapman v. Vandergrift Borough, 26 Dist. Rep. 301 (1916).

Clearly there are no expressed words in either amendment granting to the supervisors the power to engage themselves as compensable township employes in the general conduct of the business of the township. Nor can such power be fairly implied in the powers granted in the amendments and we cannot find that such authority is incidental, essential or indispensable to the powers granted in the amendments or to the objects and purposes of a second class township or the powers expressly granted to the supervisors by the code. Compare Chapman v. Vandergrift Borough, 26 Dist. Rep. 301 (1916), decided before boroughs were specifically given by the legislature authority to ap-

point borough managers, where it was held that a provision of the borough code authorizing the borough council to "appoint a solicitor, one or two street commissioners, and such other officers as it shall deem necessary," did not, by necessary implication, grant authority to the council to create by ordinance the office of borough manager and appoint a competent person to the said office.

Although the action of the chairman of the board of supervisors at the organization meeting of said board on January 6, 1969, in assigning the various members of that board as directors of the various areas of responsibility mentioned in the assignment and the resolution of the board of supervisors in confirming the said assignments and employing each of the assigned individuals do not define the powers and duties of the respective directors, the testimony before us discloses an unlegislated mutual understanding between the respective members of the board of supervisors as to the various duties of the directors in their respective areas of responsibility. It appears to us from an examination of the township ordinance creating the office of township manager and a consideration of the evidence before us that the various directorships were in fact, and in the understanding of the individual supervisors, managerial in nature. By virtue of their offices as supervisors they, as supervisors, had authority to do the things they did as "directors."

Section 510 of the code, 53 PS §65510, provided:

"The general supervision of the affairs of the township shall be in the hands of . . . (the) township supervisors."

Section 516 and 702 of the code further define their powers and duties. What they did as directors they had been doing before 1969, although not on such an individualized arrangement and, perhaps, not as efficiently and as expeditiously. Section 599.1, 53 PS §65599.1,

of the code authorized the board of supervisors to appoint a township manager and fix, by ordinance, his powers and duties, including the delegation to the manager of any of their nonlegislative powers and duties. The supervisors had, prior to 1969, by ordinance, created the office of township manager and, in a general way, fixed his powers and duties. The duties which appellees assumed by accepting the assignments made to them as "directors" were such as were delegated to, or were delegatable to, the township manager. It was, therefore, not essential that the supervisors employ themselves to perform those duties. Furthermore, section 599.1 of the code also provided:

"The office of township manager shall not be deemed incompatible with the office of township secretary, township treasurer, or any other township office or employment, except that of supervisor."

Having created the office of township manager, the supervisors could not appoint themselves to such a compensable administerial position, the two being declared incompatible by the above legislation.

The following facts also persuade us that the legislature did not intend the interpretation of the amendments of 1961 and 1963 which appellees would have us accept: Section 410 of the code has not been amended since 1956 to include an office or position relating to the conduct of the general business of the township as a compatible office or position with that of supervisors; the legislature has provided how, and within what limits, supervisors should be compensated for attending meetings (code, secs. 512 and 515, 53 PS §65512, 65515), for acting as road superintendents, laborers and roadmasters (section 515), for acting as secretary-treasurer (sections 531, 540, 53 PS §65531, 65540), but has made no provisions for compensating them when acting as administrative officers or em-

ployes of the township in the general conduct of the business of the township. Furthermore, we think that the legislature meant to exclude supervisors from the group who could be hired to conduct general township business, and said so in the amendment to subsection (e) of section 516 when it retained the words "and work on the roads themselves when directed to do so by the board of supervisors" without modification to declare an intent to permit the employment of supervisors in positions relating to the general conduct of the business of the township. The mention of one thing in the law implies the exclusion of things not mentioned, "expressio unius est exclusio alterius": Commonwealth ex rel. Maurer v. Witkin, 344 Pa. 191 (1942). Also, cl. LXII of section 702 authorizes the supervisors to make and adopt all such ordinances, by-laws, rules and regulations not inconsistent with or restrained by the constitution and laws of the Commonwealth. The compensable employment of the individual members of the board of supervisors in the positions to which appellees were assigned by appointment and resolution at the organization meeting of January 1969 is inconsistent with section 410 of the code. Therefore, the amendment of 1963 could not have the interpretation which the appellees advance.

Finally, on this phase of the issues before us, the logical consequence of appellees interpretation of the amendments of 1961 and 1963 would be that township supervisors could do anything, not actually forbidden by law, which the caprice of the supervisors may consider to be for the interest of the township. See Lesley v. Kite, supra.

Appellees finally argue that there should be no surcharge imposed upon them in this case even if it is determined that they had no statutory authority to hire themselves. Their argument rests upon the

provisions of section 545 of the Second Class Township Code, 53 PS §65545, which, in pertinent part, provides as follows:

"Any elected or appointed officer, whose act, error or omission has contributed to the financial loss of any township, shall be surcharged by the auditors with the amount of such loss, and the surcharge of any such officer shall take into consideration as its basis, the results of such act, error or omission and the results had the procedure been strictly according to law. The provisions hereof limiting the amount of any surcharge shall not apply to cases involving fraud or collusion on the part of such officers, nor to any penalty ensuing to the benefit of or payable to the Commonwealth."

Appellees argue "unless the court is shown that a financial loss in fact resulted to the township (and the exact amount thereof) the surcharge is not imposed."

The foregoing section of the code must be considered in the light of the public policy of this Commonwealth. "The public policy of a state is established either (1) by the constitution and by-laws of the state, or (2) by the judicial decisions of the courts of the state, or (3) by general consent. General consent is usually manifested in numbers (1) or (2)": Mohler's Estate, 343 Pa. 299, 303 (1941).

*"It is a well and wisely established principle of public policy in Pennsylvania that a public official may not use his official power to further his own interests. This principle* originated in the common law and has become embodied in the Constitution of Pennsylvania and has been declared to be the policy of this state in many Acts of Assembly. . . The reasons for this must be obvious — a man cannot serve two masters at the same time, and the *public interest must not be jeopardized by the acts of a*

*public official who has a direct pecuniary or personal or private interest which is or may be in conflict with the public interest": Genkinger v. New Castle, 368* Pa. 547, 551-2 (1951). (Emphasis in original.)

An early expression of the common law may be found in Commonwealth v. Douglass, 1 Binney 77 (1803), a quo warranto proceeding to test the right to the office of prison inspector of one who, as an alderman of the city, had participated in voting himself into office, where it was said "one having a discretionary authority to appoint a fit person to public office appointing himself, seems a solecism in terms; and it cannot be deemed the fulfillment of his duty."

In Commonwealth v. Bowman, 44 C. C. Rep. 127 (1916), it was held, also in a quo warranto proceeding, that county commissioners have no authority to appoint one of their own number to the office of mercantile appraiser when the person appointed participates in the election and voted for himself.

An early statutory expression of the public policy is to be found in section 66 of the Criminal Procedure Act of March 31, 1860, P. L. 400, which, so far as material, provided: "nor shall any member of any corporation or public institution, or any officer or agent thereof, be in anywise interested in any contract for the sale or furnishing of any supplies, or materials to be furnished to, or for the use of any corporation, municipality or public institution of which he shall be a member or officer, or for which he shall be an agent, nor directly nor indirectly interested therein, nor receive any reward or gratuity from any person interested in such contract or sale." This was re-enacted with some changes in section 682 of The Penal Code of June 24, 1939, P. L. 682, 18 PS §4682.

In Commonwealth v. Miller (No. 1), 31 Pa. Superior Ct. 309 (1906), it was held that a school

director who had directly contracted with the school district for the furnishing of labor, materials, horses and wagons for the use of the school district and for the repairing of buildings of the school district was properly indicted under this act. The Superior Court stated, page 315:

"The object which the legislature had in view was the prevention of the danger of temptation, incident to a relation in which the self-interest of the officer of the corporation or municipality purchasing the supplies may come in conflict with the interest of the corporation or municipality. The law was passed to enforce a rule or policy of very wide application, which, in another connection, was thus expressed: 'No man can serve two masters. He that is entrusted with the interests of others cannot be allowed to make the business an object of interest to himself, because from a frailty of nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is intrusted. The danger of temptation from the facility and advantage for doing wrong which a particular situation affords, does, out of the mere necessity, work a disqualification:' 8 Tomlin's Brown, 72, quoted with approval by Thompson, C. J. in Everhart v. Searle, 71 Pa. 256."

In Commonwealth v. Witman, 217 Pa. 411 (1907), defendant, a councilman of the City of Reading, was convicted for a violation of the foregoing act. He had supplied stone from a quarry he owned to the city and was paid therefor. The court stated, page 414, in considerring said act:

"The statute intends to prohibit persons from occupying a position in which they will be virtually contracting with themselves."

And further stated at page 418:

"The question of fraudulent intent, or unfairness in price, was not involved. . ."

In re Appeal from the Report of Township Auditors of Coal Township, 95 Pa. Superior Ct. 401 (1929), the board of commissioners of Coal Township were surcharged for purchases of stone which they had made on behalf of the township from a stone quarry owned by one of its members. On appeal by the commissioners from a surcharge at audit of their accounts, the Superior Court stated at pages 404-05:

"Both the Supreme Court and this court have considered the 66th section of the Act of March 31, 1860, supra, in a number of cases. They have uniformly held that a contract entered into in violation of its terms is prohibited by law and utterly void: Milford Boro. v. Milford Water Co., 124 Pa. 610, 623; Trainer v. Wolfe, 140 Pa. 279, 288; Com. ex rel. Whitehouse v. Harris, 248 Pa. 570; Wolford v. Upper Salford Twp. School Dist., 46 Pa. Superior Ct. 1, 3, 4. The purpose of the enactment is clearly set forth in Com. v. Whitman, 217 Pa. 411, 414, and Com. v. Miller (no. 1), 31 Pa. Superior Ct. 309, 315, and need not here be restated. The illegality of the transaction is not affected by the fact that there may have been no corrupt or dishonest intent, or unfairness in the price charged: Com. v. Miller, supra, p. 316; Milford Boro. v. Milford Water Co., supra, p. 623; Com. v. Egan, 234 Pa. 24, 26; Trainer v. Wolfe, supra, p. 288; Hanover Twp. School District's Audit, 265 Pa. 157, 163, 164; Com. v. Witman, supra, p. 418; and if payments have been illegally made pursuant to such unlawful contracts the responsible persons will be surcharged or denied credit in their accounts: Hanover Twp. School District's Audit, supra; Wolford v. Upper Salford Twp. School Dist., supra. They are not subject to ratification: Milford Boro. v. Milford Water Co., supra,

p. 623; Trainer v. Wolfe, supra, p. 288; nor subrogation, or any other device to circumvent the effect of the contract's invalidity: In Re Appeal of Sykesville Boro., 91 Pa. Superior Ct. 335. Nor are the courts concerned with the hardships which enforcement of the statute may produce: Hanover Twp. School District's Audit, supra, p. 165; Waltman v. Albany Twp. School Dist., 64 Pa. Superior Ct. 458, 469; Com. ex rel. Whitehouse v. Harris, supra, p. 573; In re Appeal of Sykesville Boro., supra. The inhibition of the statute is deeply grounded in public policy and is intended to prevent any possibility of the self interest of a public officer coming into conflict with the interests of the municipality which he represents."

Further statutory expression of the policy has been expressed in the various legislative enactments governing municipalities. For example:

The Act of April 12, 1905, P. L. 142, relating to road supervisors in townships of the second class, declared it unlawful for such supervisors to be interested either directly or indirectly in any purchases made or contracts made relating to roads and bridges. The same prohibition was carried into the Act of July 22, 1913, P. L. 915, relating to township roads, section 18, and also into section 239 of The General Township Act of July 14, 1917, P. L. 840, and section 520 of the Second Class Township Law of May 1, 1933, P. L. 103, and is currently stated in the Second Class Township Code of July 10, 1947, P. L. 1481 and the Act of May 20, 1949, P. L. 1562, and may be found in 53 PS §65520. The Act of May 23, 1874, P. L. 230, sec. 6, 53 PS §1001, prohibits any city official from having any interest in any contract for the furnishing of work or materials to the city. The Acts of May 28, 1907, P. L. 262, and June 9, 1931, P. L. 386, declared it to be unlawful for any borough of-

ficer or employe to be interested directly or indirectly in any contract for the sale or furnishing of any supplies or materials to, or for the use of, the borough or to be a member or agent or employe of a partnership or a stockholder, officer, agent or employe of any corporation interested in any such contract or work to be done for the borough. Similar prohibitory legislation with respect to officers of First Class Cities appear in the Act of June 25, 1919, P. L. 581, art. XX, sec. 3, 53 PS §12673, and of Second Class Cities in the Act of March 1, 1901, P. L. 20, art. XIV, sec. 3, as amended by the Act of May 1, 1929, P. L. 1188, sec. 1, 53 PS §22223, and the Act of March 7, 1901, P. L. 20, art. XV, sec. 1, as amended by the Act of April 14, 1937, P. L. 310, sec. 1, 53 PS §23307, and of Third Class Cities by the Act of June 23, 1931, P. L. 932, art. X, sec. 1009, 53 PS §36009, and of counties by the General County Law of 1929, P. L. 1278, sec. 64, as substantially although not identically enacted into the County Code of August 9, 1955, P. L. 323, sec. 1806, 16 PS §1806, and of municipality authorities by the Municipality Authorities Act of May 2, 1945, sec. 10(D), 53 PS §312, and of parking authorities by the Parking Authority Law, sec. 11(d), 53 PS §351.

The application of the above-mentioned statutory provisions prohibiting interest by a municipal officer in contracts of the municipality resulted in contracts which were fair and equitable and beneficial to the municipalities involved being declared illegal, in surcharges being levied against the officer having the interest although he did not personally profit, and more particularly against the legislators authorizing the contract even though there was no corrupt or dishonest intent and even though there was complete lack of knowledge of the illegality of the transaction or interest. See the quotation from In Re Appeal from the Re-

port of the Township Auditors of Coal Township, 95 Pa. Superior Ct. 401, hereinabove set forth. This apparently resulted in a moderation of the stringency of the legislation, at least as to some municipalities, for instance:

By Act of July 10, 1947, P. L. 1481, subsection (e) was added to section 802 of the Second Class Township Code and now, by Act of October 9, 1967, P. L. 371, sec. 1, is subsection (f) of section 802 of said code. See 53 PS §65802. This provision prohibited any township official who knows or who, by the exercise of reasonable diligence could know, from being interested to any appreciable degree in any contract for the sale or furnishing of any supplies or materials for the use of the township or for any work to be done for such township involving the expenditure by the township of more than $300 in any year and it provided that this limitation shall not apply to cases where such officer is an employe of the person, firm or corporation to which the money is to be paid in a capacity with no possible influence on the transactions, and in which he cannot possibly be benefited thereby, either financially or otherwise; violation of its provisions is declared to be a misdemeanor and penalties are provided. Almost an identical provision was enacted the same day, July 10, 1947, P. L. 1621, as section 1317 of the Borough Code and is now section 1404 of the code as reenacted February 1, 1966, P. L. (1965) 1656, 53 PS §46404. Similar legislation by the Act of May 27, 1949, P. L. 1955, was added as section 1810 to the First Class Township Code, 53 PS §56810, and by the Act of June 28, 1951, P. L. 662, was added as section 1905 to the Third Class City Code, 53 PS §36905.

It is to be noted that the earlier acts and the more moderate later legislation herein referred to are directed to the restriction of the interest which a public muni-

cipal official may have in contracts for the supplying of material and equipment for the use of the municipality and for work to be done for the municipality. None of them precisely restricts the municipal officer from appointing himself or participating in the voting for the appointment of himself to a compensable municipal position, or office. However, section 410 of the Second Class Township Code, 53 PS §65410, prohibits the same by providing, "Except as provided in section 514, no supervisor shall at the same time hold any other elective or appointive township office or position other than township road-master or secretary-treasurer." This provision was added to the code by the Act of June 1, 1956, P. L. (1955) 2021, and has not been amended since. See 53 PS §65410. The School Code has a similar provision: 24 PS §3-324. And the Act of May 15, 1874, P. L. 186, sections 11 and 13, 65 PS §§12, 13, prohibits councilmen of cities and boroughs from holding any office or employment in the choice of the council. In Commonwealth ex rel. v. Melvin, 18 Dist. Rep. 155 (1909), a councilman was appointed by the street committee under authority granted in the borough council to inspect work in improving certain streets, and was paid therefor. This was held to be a violation of the Act.

It is to be noted in the above-mentioned later more moderate legislation that the moderation therein expressed does not operate in favor of the municipal officer who is an employe of a person, firm or corporation to which the municipal money is to be paid in the capacity with possible influence on the transaction and in which he can be possibly benefited thereby either financially or otherwise.

Appellees have not suggested that the provisions of section 802 of the Second Class Township Code apply to the question before us and we do not think that the provisions do control in any way. The legislation per-

tains to the interest of the township official in contracts for supplies, materials and work to be furnished to the township. Its provision must be strictly construed as it is penal in nature and cannot be held to apply to a situation where a township supervisor vested with appointing power participates in the appointment of himself to a compensable municipal office or position. Compare Commonwealth ex rel. v. Melvin, supra. The very fact that the amendment denies its protection to a township officer who personally could possibly benefit from the municipal contract forecloses any argument that amelioration of the stringency of the earlier legislation by the later more moderate provisions of section 802 of the code has indicated a legislative change of the earlier public policy against a public officer appointing himself to a compensable public position.

Since shortly prior to the commencement of moderation in the statutory prohibitions of public officials having interests in municipal contracts, the Supreme Court has repeatedly and firmly expressed the policy against an official using his appointing power to appoint himself to a public office, thus:

In Commonwealth ex rel. McCreary v. Major, 343 Pa. 355 (1941), the question was: "Can council of the Third Class City legally appoint one of its members to the Board of a Municipal Authority formed by that City?" The third class city of Beaver Falls, by an ordinance enacted upon the unanimous vote of all members of the council of the city, three members of that council were named as members of the board of the authority created by that city. The lower court ousted the three said persons from membership on the board of the authority and the Supreme Court affirmed, stating, inter alia, page 359:

"We are fully conscious of the great import of the

question here for our determination, . . . We have had no difficulty in reaching our conclusion and are unanimously of opinion that well-established public policy prohibits respondent and his colleagues from using their official appointing power as councilmen of the City of Beaver Falls to appoint themselves members of the Board of the Authority. This Court said, as early as 1803, in The Commonwealth v. Douglass, 1 Binney 77, 84: 'One having a discretionary authority to appoint a fit person to a public office appointing himself, seems a solecism in terms; and it cannot be deemed a fulfillment of his duty.' . . .

"The power of the court to determine what is against public policy, in a proper case, is well recognized. We said in Mamlin v. Genoe, 340 Pa. 320, 325: 'It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal.' That there is a 'virtual unanimity of opinion' among all reasonable men that it is against public policy for a public official to appoint himself to another public office within his gift is beyond all question. Courts, not only of this Commonwealth, but of every other jurisdiction known to us, have uniformly held that personal interest of a public officer creates disqualification. In this connection, we said, in Commonwealth v. Raudenbush, 249 Pa. 86, 88-89: 'A member of a municipal council is disqualified from voting in proceedings involving his personal or pecuniary interest: 20 Am. & Eng. Ency. of Law (2d Ed.), 1214 . . . It is against public policy

for a representative of a municipality to vote in its legislative body on any matter which affects him individually . . . A councilman cannot vote on any contract or measure in which he is pecuniarily interested. This was the rule of the common law and statutes have been enacted in most jurisdictions forbidding such voting. A councilman cannot act for the municipality and at the same time act for himself individually. He cannot serve two masters at the same time. He is a trustee for the municipality and he may not deal with himself in any matter which concerns it.' . . . (citing authorities from the appellate courts of other states) . . . Furthermore, even if respondent had not voted for his own appointment, for the other members of Council of which he was a member to have placed him on the Board of the Authority would, nevertheless, still have been definitely against public policy. Meglemery v. Weissinger, 140 Ky. 353; Wood v. Town of Whitehall, 120 Misc. 124, 197 N.Y.S. 789.

"A careful reading of the 'Municipality Authorities Act of one thousand nine hundred and thirty-five', as amended, under the provisions of which the Authority here under consideration was created, reveals not the slightest indication of an intention on the part of the legislature to waive this sound principle of law and morals. While it cannot be questioned that the General Assembly has the inherent power to declare the public policy of the Commonwealth and may confer upon members of Council of municipalities power to appoint themselves to membership upon Boards of Authorities and to fix their own salaries, such grant of power must be strictly construed, and unless the intention is clear, the power will be denied, because of its exceptional and extraordinary character. We said, in this connection, in the recent case of Reckner

v. German Twp. S. D., supra (p. 378): 'It necessitates an explicit direction on the part of the legislature to overthrow such a wholesome and salutary rule of the common law as that precluding a public servant from simultaneously representing both himself and his constituents. As pointed out in Goodyear v. Brown, 155 Pa. 514, 518: ". . . it does not follow that everything may be done by a public officer that is not forbidden in advance by some act of assembly." ' See also McQuillin on Municipal Corporations, Second Ed., Revised Vol. 2, pp. 306-307."

The public policy announced in Commonwealth ex rel. McCreary v. Major is reaffirmed by reference thereto in Spencer et al. v. Snedaker, 361 Pa. 234, at 238 (1949). See also Miexell v. Hellertown Borough Council, 370 Pa. 420 (1952); Eways v. Reading Parking Authority, 385 Pa. 592, 602, 603 (1956), and the policy statement hereinabove quoted from Genkinger v. New Castle, supra.

Turning now to a consideration of the legislative history of section 545 of the township code upon which appellees rely, we find that the act relating to county and township officers, of April 15, 1834, P. L. 537, sec. 102, merely directed that the township auditors audit the accounts of the supervisors. The Act of May 3, 1909, P. L. 392, relating to the settlement and audits of the accounts of officers of boroughs, townships, poor districts and school districts required the same duties of the auditors and further provided: "And any officer whose act or neglect shall have contributed to the pecuniary loss of the municipality or district shall be charged by the auditors with the amount of such loss."

The Act of June 9, 1911, P. L. 865, relating to the same subjects and the Act of Aug. 3, 1909, supra, in

section 1 thereof, imposed the same duties upon the auditors and contained the identical provisions hereinabove quoted from the Act of 1909.

The General Township Act of July 14, 1917, P. L. 840, sec. 325, provided:

"Any officer whose act or neglect has contributed to the financial loss of any township shall be surcharged by the auditors with the amount of such loss."

This same provision was embodied in section 545 of the Second Class Township Code of May 1, 1933, P. L. 103. An identical provision was contained in the Borough Code of May 14, 1915, P. L. 312, chap. VII, art. IV, sec. 1, and a similar provision in the Borough Code of May 4, 1927, P. L. 519, sec. 1035. An identical provision is contained in the First Class Township Code of June 24, 1931, P. L. 1206, sec. 1003, as amended to and inclusive of the Act of Oct 5, 1967, P. L. 345, sec. 1, and the Act of Dec. 14, 1967, P. L. 819, sec. 1, and the Act of Mar. 2, 1970, P. L. 74 sec. 1.

Under these earlier acts of assembly, municipal officers were surcharged for the entire amount of municipal funds expended contrary to law through their act or neglect, and not merely for the difference between the sum actually paid out and the actual value which the municipality received, and without regard to the motivation of the officer or his ignorance of the law, the good faith of the expenditure, and whether or not the municipality sustained financial loss or benefit. See Hanover Township School District's Audit, 265 Pa. 157 (1919); Chester School District's Audit, 301 Pa. 203 (1930); In Re Appeal from the Report of Township Auditors of Coal Township, 95 Pa. Superior Ct. 401 (1929); Lower Nazareth Township Supervisors' Appeal, 341 Pa. 171 (1941); Likovich Appeal, 347 Pa. 40, 46 (1943). The foregoing decisions and others held that the words

"financial loss" and "pecuniary loss," in the acts, meant the entire amount of any payment illegally made from municipal funds and not merely the difference between the sum paid and the actual value to the municipality of the work done or benefits received. See Scranton School District Audit, No. 1, 354 Pa. 225, 231 (1946). The strict construction which was placed upon the legislation resulted in great hardship to municipal and school district officers, who, though acting illegally in the expenditure of municipal or school district funds did so in good faith or in ignorance of the law and although the municipality or district received full value or more for the expenditures made.

The severity of the law as so applied was relaxed as to the school districts by the Act of May 29, 1931, P. L. 243, amending section 517 of the School Code of May 18, 1911, to read as follows:

"Any school director voting for, or any officer approving, a school order for the payment of school funds for any other purpose, or drawn in any other manner, than that provided in this act, shall, together with the surety or sureties on his bond, in addition to the penalty herein provided, be individually liable to the district for the amount thereof: *Provided, however, That on appeal from an auditor's report, it shall be within the discretion of the court having jurisdiction of the matter to sustain or not to sustain a surcharge where it appears that the appellant or appellants acted honestly and in good faith for the best interests of the school district, and where no loss or damage to the school district resulted from the action of such appellant or appellants.*" (The amendment is indicated by italics.)

The same provision was identically reenacted in the Public School Code of March 10, 1949, P. L. 30, sec. 608, 24 PS §6-608, without amendment to the present time.

In Scranton School District Audit (No. 1), 354 Pa.

225 (1946), being eager to have the athletic park properly drained and graded and to make repairs to the grandstand, dressing and shower rooms, the school directors did not comply with the provisions of the School Code requiring contracts in excess of $300 to be awarded to the lowest and best bidder after due public notice, instead causing the work to be done with school district workmen from materials already on hand and some which were purchased. They were surcharged for the cost of the completed job. The lower court sustained the surcharge and the Supreme Court reversed. It found that the directors had acted with the approval and advice of their solicitor; that they were ignorant of the legal requirements of the law and innocent in their motives, but that these considerations did not exempt them from not obeying a mandatory duty imposed by law. The court found that the action of the directors was illegal, but the appeal from the imposition of the surcharge was sustained, the court finding that there was no evidence that any of the directors sought gain for themselves or were guilty of any favoritism and that the school district would have been obliged to pay a greater, not less, sum than the sum actually expended for the work. It held that the words "loss or damage"' in the amendment should not be construed the same as "financial loss" had been previously construed and the court said that by virtue of the Act of May 29, 1931, "they were entitled, because of their honesty of purpose and because no loss or damage resulted to the school district, to be relieved from the imposition of a surcharge."

Further relief from the strict construction which had been placed on the earlier statutes was given to public officials of political subdivisions by the Act of May 15, 1945, P. L. 538, 65 PS §§191 and 192, which provided as follows:

"Section 1: No elected or appointed official of any political subdivision shall be surcharged for any act, error or omission in excess of the actual financial loss sustained by the political subdivision by reason thereof, and the surcharge of any such official shall take into consideration as its basis, the results of such act, error or omission and the results had the procedure been strictly according to law.

"Section 2: The provisions of this act shall not apply to cases involving fraud or collusion on the part of such officers, nor to any penalty enuring to the benefit of, or payable to, the Commonwealth."

The above Act of 1945 was repealed insofar as it relates to townships of the second class by the Act of July 10, 1947, P. L. 1481, sec. 49, and section 7 of said Act of 1947 amended section 545 of the Second Class Township Code, insofar as here pertinent, by providing as follows, 53 PS §65545:

"Any elected or appointed officer, whose act, error or omission has contributed to the financial loss of any township, shall be surcharged by the auditors with the amount of such loss, and the surcharge of any such officer shall take into consideration as its basis, the results of such act, error or omission and the results had the procedure been strictly according to law. The provisions hereof limiting the amount of any surcharge shall not apply to cases involving fraud or collusion on the part of such officers, nor to any penalty ensuing to the benefit of or payable to the Commonwealth."

A somewhat similar amendment was made to section 1035 of the Borough Code of May 4, 1927, P. L. 519, by the Act of May 28, 1945, P. L. 1089. (The text of the amendment to the Borough Code now appears as subsection (c) of section 1041 of the code. See 53 PS §46041). Insofar as we have found, there has been no amendment of the earlier legislation pertaining to the

surcharge of officers of townships of the first class whose act or neglect has contributed to the financial loss of the township.

The decisions under the Act of 1945, P. L. 553, and the similar texts thereafter embodied by amendments into the Second Class Township Code and the Borough Code, all seem to agree that before a public officer may be surcharged for his act or omission there must be evidence to substantiate a finding that the municipality has, in fact, suffered an actual monetary loss. See Davis v. Carbon County, 369 Pa. 322 (1952); Yenerall Appeal, 165 Pa. Superior Ct. 144 (1949); In Re West Salem Township's Auditors' Report, 62 D. & C. 253 (1947), wherein it is also said that the Act of 1945 "discloses the clear purpose not to penalize public officers for mere mistakes of judgment." See also Appeal from Audit of Annual Township Report of Supervisors of Highland Township, 8 Chester 345 (1958); Hazel Township Appeal, 51 Luz. Leg. Reg. 207 (1957).

In arriving at conclusions as to whether the acts, errors or omissions of the municipal officers had resulted in actual financial loss to the municipalities, the courts appeared to have taken into consideration "the results of such act, error or omission and the results had the procedure been strictly according to law." However, in none of the reported decisions which we could find was the court confronted with the question before us. We are of the opinion that they do not control the determination that we must reach and we are not persuaded that the Act of 1945, P. L. 538, or section 545 of the Second Class Township Code decree that appellees in this case may retain the compensation paid to them as directors of the areas of responsibility assigned to them at the board of supervisors organization meeting of January 1969 for the following reasons:

1. The public policy of the Commonwealth of Pennsylvania as expressed in the statutory enactments and decisions of the courts hereinabove set forth at large prohibits public officials from profiting or benefiting from their office over and above the compensation allowed them by law and particularly prohibits an officer with the power of appointment appointing himself to a compensable office or position. While it cannot be questioned that the General Assembly has the inherent power to declare the public policy of the Commonwealth and may confer upon members of legislative boards of municipalities power to appoint themselves to compensable offices or positions in the municipality and to fix their salaries, such grant of a power must be strictly construed and, unless the intention is clear, the power will be denied, because of its exceptional and extraordinary character: Commonwealth ex rel. McCreary v. Major, supra, pages 361-62. "It necessitates an explicit direction on the part of the legislature to overthrow such a wholesome and salutary rule of the common law as that precluding a public servant from simultaneously representing both himself and his constituents": Reckner et al. v. Germantown Township School District, 341 Pa. 375 (1941).

" 'A purpose to disregard sound public policy must not be attributed to the law-making power, except upon the most cogent evidence' ": Brock's Assigned Estate (No. 3), 312 Pa. 92 (1933).

There is no such intention expressed in the Act of 1945 or in Section 545 of the Township Code.

2. The provisions of section 410 of the code, 53 PS §65410, prohibiting a second class township supervisor from holding at the same time any other elective or appointive township office or position other than roadmaster, road superintendent or laborer or secretary-

treasurer, which are mandatory, would be nullified, if the provisions of the Act of May 15, 1945, P. L. 538, or the provisions of section 545 of the code were held to be applicable to the extent of permitting supervisors to hold positions such as those in question here and to be compensated therefor.

3  As we have found, the services which appellees performed in their positions as directors were services which fell within the scope of their duties as supervisors of the township. The Legislature has provided how, and within what limits, supervisors may be compensated for attending meetings (Second Class Township Code, secs. 512 and 515, 53 PS §§65512, 65515), for acting as road supervisors, laborers and roadmasters (section 515) for acting as secretary-treasurer (sections 531, 540, (53 PS §§65531, 65540)), but has made no provisions for compensating them when acting as administrative officers or employes of the township in the general conduct of its business. The constitutional provision forbidding an increase in salary or emoluments of a public officer during the term of his office is inexorable and may not be avoided by indirection: Sellers v. Upper Moreland Township School District, 385 Pa. 278, 282 (1956). We quote at length from the decision of this court in Delaware River Joint Toll Bridge Commission v. Miller, 9 Bucks L. Rep. 104, 110, et seq. (1959).

"We think it is equally well established that when the compensation is fixed by act of assembly, no agreement, specific or otherwise, changing the compensation should receive the sanction of the court.

"Over a century ago in the case of Commonwealth v. Mayor of Lancaster, 5 Watts 152, this principle was clearly enunciated and we have found no deviation from it in any of the cases we have discovered.

"In that case, which is not only apposite but strikingly similar to the case before us as to the factual situation, the members of council of the City of Lancaster appointed one of its members to serve on a special committee in connection with the survey, construction and location of a railroad. The pleadings averred that: 'In the performance of his duties as member of the committee, besides attending many deliberative meetings of the committee, he spent about one hundred days on the road, during many of which he was employed from morning till night in fatiguing manual labor.' The question was whether he was entitled to compensation for his additional services.

"The court answered this question in the negative, page 156:

" 'Now the compensation sought was earned by the relators, if at all, in the character of common councilmen; for in no other could they have been members of the committee. But take it they acted as individuals employed in a particular service, and the result must be no better for them; for by no device can the character of a councilman and that of a paid servant of the councils be legitimately united in the same person; and though we cannot prevent it in the first instance, we can prevent the accomplishment of its purpose by withholding our assistance from it.'

"Similar expressions are contained in a number of decisions of our courts. Thus in Rothrock v. School District, supra, cited with approval in Nowling v. Newell, 65 Pa. Super. 67, the court says: 'When a public officer claims a salary, fees, or compensation for services rendered to the public, he must show an act of assembly giving it. If he cannot show such an act, he cannot recover.'

"In McKean County v. Young, supra, p. 488, the

court says: ' "An officer derives equally his authority and his compensation from the law, and when both are defined in the law, he can no more enlarge the one than the other:" Brown v. Com., 2 R. 40. "Where a positive law prescribes the manner and nature of the payment to be made to an officer, the directions of the law are and ought to be the only rule." '

"We here quote at length from Lawson v. Allegheny County, 326 Pa. 242, 243, because it so clearly discusses the reason for the rule:

" 'Work outside of office hours ordinarily will not justify extra pay where the salary is definitely prescribed by law; and, in such case, services performed by the officer outside of his official duties will not entitle the officer to additional compensation. Knowledge on the part of the municipal authorities of the performance of extra service will not bind the local corporation to give additional pay. Nor can extra compensation be allowed by virtue of usage, although of long standing. Nor will a promise to pay the officer extra compensation bind the municipal corporation, as such promise is against "sound policy, and quasi-extortion": McQuillin on Municipal Corporations, 2nd Ed., Vol. 2, sec. 544. It is a well-settled rule that a person accepting a public office, with a fixed salary, is bound to perform the duties of the office for the salary. He cannot legally claim additional compensation for the discharge of these duties, even though the salary may be a very inadequate remuneration for the services . . . Whenever he considers the compensation inadequate he is at liberty to resign. The rule is of importance to the public. To allow changes and additions in the duties properly belonging or which may properly be attached to an office to lay the foundation for extra compensation, would produce intolerable mischief. The rule, too, should be rigidly enforced. The statutes of the legisla-

ture and the ordinances of our municipal corporations seldom prescribe with much detail and particularity the duties annexed to public office; and it requires but little ingenuity to run nice distinctions between what duties may and what may not be considered strictly official; and if these distinctions are much favored by courts of justice, it may lead to great abuse.' Dillon, Municipal Corporations, (5th Ed.), Vol. 1, Sec. 426 (233). A public officer cannot claim additional compensation for the discharge of his duties, though the latter be increased without any corresponding increase in his salary or fees: Hays v. City of Oil City, 8 Sadler 185, 11 A. 63; Lehigh County v. Semmel, 124 Pa. 358, 16 A. 876; Bovaird v. Bradford, 232 Pa. 600, 81 A. 719. A contract made by the commissioners of a county to give to the county solicitor, whose salary was fixed by law, an additional compensation for services to be rendered by him, lying within the sphere of his official duties as prescribed by statute, is ultra vires and incapable of ratification: Lancaster v. Fulton, 128 Pa. 48, 18 A. 384.'

"For cases in other jurisdictions, see 159 A. L. R. 606.

"Then, too: 'It is a well and wisely established principle of public policy in Pennsylvania that a public official may not use his official power to further his own interests . . . The reasons for this must be obvious—a man cannot serve two masters at the same time, and the public interest must not be jeopardized by the acts of a public official who has a direct pecuniary or personal or private interest which is or may be in conflict with the public interest.' Eways v. Reading Parking Authority, 385 Pa. 592, 602-603.

"We see no reason to deviate in this case from these firmly established and well-considered standards of public policy. To hold otherwise would open the door to vicious practices, corruption and fraud. This is not

to imply that the present defendant was acting otherwise than innocently. This proposition is not before us, for even in cases where the compensation is paid by mistake, as in Allegheny County v. Grier, 179 Pa. 639, or when payments are apparently properly made under an act subsequently held to be unconstitutional (Berks County Institution District v. Schoener, 383 Pa. 210; Loushay Appeal, 169 Pa. Super. 543, affirmed at 370 Pa. 453) compensation erroneously paid may be recovered."

We do not find, in the provisions of section 545, an expression of legislative intent which would justify appellees in retaining the compensation paid to them for their services while acting as directors.

4. The Second Class Township Code fixed the compensation which the supervisors may receive for attending meetings. Insofar as pertinent for the present phase of our discussion, section 512 thereof, 53 PS §65512, provided:

"Monthly meetings; quorum, rent and expenses. — The township supervisors shall meet for the transaction of business at least once each month, at a time and place to be fixed by the board, but they shall not be paid for more than sixteen meetings in any one year, except in any township where, on account of the exercise of governmental functions other than those relating to roads, more meetings are necessary, in which case, the number of meetings for which the supervisors may be paid may be increased to any number, not exceeding twenty-four in any one year, in townships having a population of five thousand or less, and in townships having more than five thousand not exceeding fifty meetings in any year . . ."

Warminster Township's population exceeded 5,000. Section 515, 53 PS §65515, provided:

"Compensation of Supervisors. — Supervisors may

receive from the general township fund, as compensation, ten dollars for each meeting they attend . . ."

It is apparent, therefore, that the maximum compensation allowed to supervisors by the foregoing provisions for attending meetings is the sum of $500 in one year. The testimony discloses that the appellees attended more than 50 meetings of the Board of Supervisors in the year 1969 and were legitimately paid under the foregoing provisions of the code the maximum sum of $500 for such attendance. The testimony also disclosed that the compensation paid to appellees which is the subject of this appeal was paid to and received by appellees as compensation for their services in the general conduct of the township business in the areas of township activities to which they had been assigned, including compensation for attending special meetings of the board of supervisors and executive sessions of said board, which were in excess of the 50 board meetings for which appellees had been paid by authority of sections 512 and 515 of the code. To the extent that the compensation paid, which is the subject of this appeal, was paid for attending board meetings there was a violation of sections 512 and 515. Assuming arguendo that the township did not suffer a financial loss by reason thereof, an assumption we do not make, and conceding that the township benefited by the appellees' attendance at, and participation in, the special meetings of the board of supervisors and the executive sessions thereof for which they received, in part, the additional compensation, and being satisfied that there was no fraud actual or intended on the part of appellees, if the provisions of section 545 of the code are held to control the issue before us to the extent of permitting appellees to retain the additional compensation which they had received, the salary limitations imposed by sections 512 and 515 of the

code are nullified and become of no effect as to all situations wherein the board of supervisors of a Second Class Township votes its member additional compensation for attending meetings over and above the number of compensable meetings allowed by the said sections of the code. This court cannot allow the provisions of section 545 to be made an entering wedge to destroy the limitations fixed by sections 512 and 515 of the code. We do not find a legislative intent to that effect. Furthermore, the payment of the additional compensation being unlawful, as above pointed out, section 545 of the code would have no application unless the township suffered no financial loss therefrom and the result of the appellees voting themselves such compensation vis-a-vis the results had they proceeded according to law would support the conclusion that a surcharge should not be imposed. Those who are endeavoring to escape liability by virtue of an exception alleged to operate in their favor have the burden of proving all of the facts the existence of which is necessary to entitle them to the benefit of the exception: Chester School District's Audit, 301 Pa. 203, 212 (1930).

Appellees have not sustained this burden of proof to bring themselves within the benefits of section 545. It is clear to us that the township did suffer financial loss to the extent that the additional compensation paid to appellees was for the purpose of attending board of supervisor meetings whether the same were executive sessions or special meetings. The general supervision of the affairs of the township rested in the hands of the supervisors: Code section 510. It was the duty of the appellees as members of the board of supervisors to attend as many meetings of that board as were necessary to discharge the duties of their office and they were bound to perform the duties of the office

for the salary fixed by the code. See Lawson v. Allegheny County, 326 Pa. 242 (1937), wherein it was held that a person employed by a county as an architect at an annual salary may not receive additional compensation for work done outside of office hours, of the same character as that performed by him in his regular employment, even though the extra work is done on the orders of his superior and with the knowledge of the county commissioner, and wherein the court quoted from Dillon, Municipal Corporations, (5th ed.), vol. 1, sec. 426 (233), as follows:

"It is a well-settled rule that a person accepting a public office, with a fixed salary, is bound to perform the duties of the office for the salary. He cannot legally claim additional compensation for the discharge of those duties, even though the salary may be a very inadequate remuneration for the services . . ."

See also Delaware River Joint Toll Bridge Commission v. Miller, supra. Therefore, appellees were not entitled to receive that portion of the additional compensation which was received by them for attending the additional board of supervisor meetings. None of the appellees have submitted to this court at the hearings herein, or submitted to the board of supervisors prior thereto, records of the amount of time spent by them at board meetings for which they received the additional compensation or the number of meetings they attended for such compensation, nor records of the hours spent or work done in other activities and in discharge of their offices as directors. Even if appellees were entitled to retain that portion of the additional salary attributable to the services performed as directors other than attending board meetings there is not sufficient evidence before us to apportion the compensation paid between services in attending meetings and other services performed as directors.

Therefore, appellees should be surcharged for the entire additional compensation paid to them.

There is a final reason which leads us to conclude that this appeal must be sustained, viz.:

In our opinion Franklin Township Auditors' Report, 202 Pa. Superior Ct. 415 (1963), dictates the determination which we must make. In that case, a decree of court created the Borough of Franklin Park out of all of the Second Class Township of Franklin. Section 211 of the Borough Code provided that the area should continue to be governed as before the incorporation until the first Monday of January following the municipal election next succeeding the issuance of the final decree of incorporation. Following the decree of incorporation, the township supervisors continued to govern the borough until the first elected councilmen took office. Prior to the incorporation of the borough, the township supervisors had each been receiving compensation at the rate of $192 per year under the provisions of the Second Class Township Code. Upon creation of the borough, they set their own salaries at $20 per month for a total of $240 per year by virtue of authority which they believed to be vested in them by section 1001 of the Borough Code, 53 PS §46001, which provided that compensation of councilmen may be set by ordinance in an amount determined by the population of the borough. Upon a later audit of the supervisors' accounts, the township auditors concluded that the supervisors were required to continue to govern the municipality under the provisions of the Second Class Township Code until the first elected borough councilmen took office and that the supervisors had no authority to pay themselves in the manner that the Borough Code provided for the paying of councilmen. Accordingly, the auditors surcharged the supervisors in sums equal to the difference between the compensation they would have received as

township supervisors under the provisions of the Second Class Township Code and the salaries they voted themselves after assuming the powers of the borough council. Upon appeal by the supervisors to the court of common pleas, the surcharge was set aside. The Superior Court on appeal reinstated the auditors' surcharge. The Superior Court stated that the statute is clear that until the first elected councilmen took office the supervisors were required to govern the area in the manner as it was governed before the incorporation. "[The Supervisors] were elected as township officers under a law that fixed their maximum compensation. They had no statutory power to pass an ordinance setting their own salaries in excess of that amount . . . They personally profited by their own unlawful act, even though it probably was done in good faith. They should not be permitted to keep the excess compensation. The excess received over the amount allowed supervisors under The Second Class Township Code should be returned by them to the municipal treasury. We recognize that during the period of transition from a township to a borough there are bound to be problems which are not specifically covered by the statutory law and that the courts must be considerate of municipal officials who, in good faith, make decisions under such circumstances. This solicitious consideration, however, does not extend to officials who by their own action pay themselves more than the law allows."[3]

It is our conclusion that appellees acted in entire good faith without fraud or guile in voting to themselves and receiving the additional compensation of $100 a month during the year 1969 for the services

---

[3] Section 545 of the Second Class Township Code was not referred to in this opinion. It is difficult to believe that counsel for the Franklin Township Supervisors would not have called it to the attention of the Superior Court.

which they rendered to the township in their offices or positions as directors of the areas of responsibility to which they had been assigned at the organization meeting of the board of supervisors in January of 1969. Nevertheless, their acts in voting and receiving such additional compensation were unlawful in nature, and they must remit to the township the sums so received. "Honesty is concerned with the moral rather than the legalistic import of an act; these directors were not guilty of any moral turpitide": Scranton School District Audit (No. 1), supra, page 230.

There shall be no liability of the township to appellees for income and social security taxes withheld by it from the additional compensation paid by the township to the appellees which the township has paid over to the taxing authorities.

Appellants herein, William Benge and Paul Dietrich, claim that they are entitled to have the court enter an order paying reasonable counsel fees to their attorney and the costs of this litigation in accordance with section 563 of the Second Class Township Code, 53 PS §65563. The referred-to legislation states:

"When an appeal is taken from the township auditors' report or settlement of the account of any township officer, and such appeal results favorably to the appellants in such a manner that money is recovered for any township, the court hearing such appeal shall make an order to pay a reasonable counsel fee." In accordance with the mandate of this provision of the Second Class Township Code, we have found that reasonable counsel fees for appellants' attorney shall be the sum of $250.

In consideration of the importance to appellees and the township of the conclusions and determination herein reached, the order herein shall be entered nisi so that said appellees and appellants may have an opportunity, if they so desire, to argue any issues herein before the court en banc.

## ORDER

And now, July 26, 1971, it is ordered and directed that Charles E. Cotlar, Ronald Wallace, Joseph Lingo and Charles M. Hoffman, Supervisors of the Township of Warminster, Bucks County, Pa., are subject to surcharge each in the sum of $1,100 for moneys unlawfully paid to each of them from the funds of the Township of Warminster as compensation for services during 1969 in the following positions: director of planning and zoning, Mr. Hoffman; director of municipal affairs, Mr. Lingo; director of fiscal and administrative affairs, Mr. Wallace; director of public safety, Mr. Cotlar.

The prothonotary is directed to enter judgment in favor of the Township of Warminster and against the following persons in the following amounts: Charles E. Cotlar, $1,100; Ronald Wallace, $1,100; Joseph Lingo, $1,100; Charles M. Hoffman, $1,100.

The Township of Warminster is ordered and directed to pay to Robert T. Burke, Esq., attorney for appellants herein, the sum of $250 as counsel fee for his services in connection with the within appeal.

The cost of this proceeding shall be paid by appellees.

This order shall be entered as an order nisi and shall become final unless exceptions are filed hereto within 20 days of the date hereof.